Nelson, «T.,
delivered the opinion of the Court.
There was no error, on the part of the Chancellor, in dismissing complainant’s bill, but we do not concur in the reason assigned, in the decree, for his action. If the case rested- alone upon the authority of 'Wilkerson, as Summerhill’s agent, or bailee, to employ a sub-agent to sell the cotton in order to prevent its destruction, he was well justified in assuming such authority for the benefit of his principal. But it appears, from the pleadings and proofs, that Summerhill sent the twelve bales of cotton, in the first instance, to his son-in-law, Wilkerson, for the jrarpose °f having the cotton “spun on the shares,” by Yalentine; that they remained at Wilkerson’s about six months; that the Confederate authorities were engaged in destroying cotton, with the view of preventing its sale to, or capture by, the Federáis or their soldiers; that Wilkinson, being apprehensive that it would be taken, or destroyed, made a contract with the complainant, in the summer of 1863, and pending the late civil war, by which the complainant was to take the cotton and do the best he could with it, and, as complainant alleges, “to run it out through the lines to market within the Federal lines.” Complainant alleges that it was also agreed that he was to haul the cotton to the Tennessee river in the *206 night time; that it was to be privately concealed, or so managed as to avoid any discovery by the Confederate soldiers; that he delivered it, accordingly, on these terms, to one Mangum; that he, Mangum, and "Wilkerson were, each, to haye one third of the proceeds of sales; that in delivering the cotton, he “ subjected himself and his property to great hardship and danger;” that Mangum floated the cotton down the river to Savannah, and sold it to "W. H. Cherry, in a damaged condition; that it was taken out of the river on the west side, opposite to Savannah, to be dried, but was seized in a few days and burned by the Confederate cavalry; that Summerhill, who is a citizen of Alabama, af-terwards brought suit, in the Circuit Court of Hardin county, to recover the value of the cotton, and obtained judgment against Mangum, on the 27th March, 1869, for $1,064, being two-thirds of the value of the cotton — the remaining one-third being-allowed, as complainant supposes, to Mangum for his services. Complainant insists that the cotton was worth $1,200, and that he is entitled to one-third of its value, with interest; and he accordingly enjoined the collection of one-half the amount of the judgment. The most material allegations of the bill are sustained by the evidence; but it is unnecessary to analyze the testimony, as we are clearly of opinion that the contract, as stated and established by the proof, was illegal and void, and that no recovery can be had upon it at law or in equity.
*207 "We have, repeatedly, held that the late civil war was a public war, and that, while it continued, the two parties to it stood o^i the same ground, in every reúpect, as if it had been a public war between two uiilbfent nations. No'principle-is better settled than that the effect of such a war is to interrupt and interdict all commercial correspondence, intercourse and dealing, between the citizens or subjects of the two countries engaged in it. In 1 Kent’s Com., 67 m., it is said that: “It follows, as a necessary consequence of the doctrine of the illegality of all intercourse or traffic, without express permission, that all contracts with the enemy, made during the war, are utterly void. The insurance of enemy’s property is an illegal contract, because it is a species of trade and intercorrrse with the enemy. The drawing of a bill of exchange by an alien enemy, on a subject of the adverse country, is an illegal and void contract. The purchase of. bills on the enemy’s country, or the remission and deposit of funds there, is a dangerous and illegal act, because it may be cherishing the resources, and relieving the wants of the enemy. The remission of funds in money or bills, to subjects of the enemy, is unlawful. The inhibition reaches to every communication, direct or circuitous.” See, also, Law. Wheat. Int. Law, 2nd ed., 544; Halleck Int. Law, 357, 358; Scholefield v. Eichelberger, 7 Pet., 586; 1 Story Con., §§ 608, 611, 4th ed.; Billgery v. Branch, 8 Am. Law Register, 1869, p. 334.
The contract to transport the cotton into the *208 Federal lines for sale, was not only illegal am’ void upon principles of international law, but vras contrary to the well known public policy of the Confederate States as a dc for,!a government, and to Ac laws of war, as promulgated by the United Staler, and various Acts of Congress, enacted during the war, to prohibit commercial intercourse with the States engaged in insurrection. See General Orders, No. 100, April 24, 1863; Leiber’s Instructions, sec. 86, p. 78; Acts of July 13, 1861, sec. 5, and March 12, 1863, sec. 4; Mr. Lincoln’s Proc., August 16, 1861 — March 31, 1863; and General Orders, No. 88, March 31, 1863; the Ouachita Cotton, 6 Wal., 521; Coppell v. Hall, 7 Wal., 542; McKee v. United States, 8 Wal., 163.
It was held, in Allen v. Dodd, 4 Hum., 132, that a contract malum in se, immoral or contrary to public policy, cannot be enforced. And so of a contract made in direct violation of a public law: Yerger v. Rains, 4 Hum., 259. Numerous other cases, in this and other States, sustain the same doctrine.
Affirm the decree, at complainant’s costs in this Court and the Court below.