ARLINGTON HOTEL COMPANY *v.* CARUTHERS EWING.

(*Jackson.*   April Term, 1911.)

1. **CONTRACTS.** For suspension of enforcement or operation of a valid criminal law is illegal and unenforceable.

Where an attorney contracted with certain persons engaged in the liquor business, to test the constitutionality of a prohibition act, and for an additional stipulated fee, in the event he succeeded "in suspending the enforcement or operation of the act until the meeting of the next supreme court in the spring of 1910," such contract, in so far as it provided for the suspension of the enforcement of the act, and thereby to render a valid criminal law of the State nugatory, was illegal and unenforceable, and the attorney cannot recover the additional stipulated fee for that particular service. (*Post, pp.* 538-552, and especially 548, 549.)

Acts referred to and construed: Acts 1909, chs. 1 and 10.

Cases cited and approved: Allen v. Dodd, 4 Humph., 131; Hale v. Henderson, 4 Humph., 199; Yerger v. Rains, 4 Humph., 259; Isler v. Brunson, 6 Humph., 278; Lea v. Collins, 4 Sneed, 393; Nichols v. Cabe, 3 Head, 92; Parks v. McKamy, 3 Head, 297; Rhodes v. Summerhill, 4 Heisk., 204; Heart v. Brewing Co., 121 Tenn., 71.

2. **SAME.** Enforcement or operation of a valid criminal statute cannot be legally stayed or enjoined.

There are no means known to the law whereby the operation of a valid criminal statute can be legally suspended or its enforcement stayed; for such a statute cannot be enjoined, and if parties are indicted thereunder, and they are defended, this does not legally stay the operation of the statute, since each additional offense under the statute is an additional crime, for which a new indictment may be found and a new prosecution waged. (*Post, pp.* 549, 550.)

Hotel v. Ewing.

3. **SAME. Lawful by its terms is legal, though illegally performed; but contract to violate the law is illegal, though legally performed.**

If a contract can, by its terms, be performed lawfully, it will be treated as legal, even if performed in an illegal manner; while a contract entered into with intent to violate the law is illegal, even if the parties may, in performing it, depart from the contract, and keep within the law. (*Post, p.* 550.)

4. **SAME. To test the constitutionality of a constitutional statute is valid; but contract to suspend or nullify its operation is void.**

A lawyer may properly undertake to test the constitutionality of a criminal statute, which is in fact constitutional, and such contracts are often made; but, if, in addition to his undertaking to test its constitutionality, he contract that he will, pending such test, suspend or nullify its operation, the contract is void. (*Post, p.* 552.)

5. **SAME. No recovery as on a quantum meruit in an action on an illegal contract.**

Where a lawyer sues on an illegal contract for services rendered thereunder, he cannot recover as on a *quantum meruit*. (*Post, p.* 552.)

6. **PEREMPTORY INSTRUCTIONS. Erroneously refused by the trial court will be granted by the supreme court, and the suit dismissed, when.**

Where the trial court should have granted the peremptory instructions asked for by the defendant, the supreme court, rendering such judgment as the trial court should have rendered, will sustain the motion, and dismiss the suit, with costs. (*Post, pp.* 548, 552.)

FROM SHELBY.

Appeal from the Circuit Court of Shelby County.—H. M. McLaughlin, Judge.

Greer & Greer, for Hotel Company.

Percy Finlay, for Ewing.

Mr. Justice Neil delivered the opinion of the Court.

This action was originally brought before a justice of the peace of Shelby county, and a judgment rendered, from which judgment an appeal was prayed to the circuit court of that county, and a judgment there pronounced in favor of the defendant in error. An appeal was then prosecuted to the court of civil appeals, where the judgment was affirmed, and from this judgment the plaintiff in error prosecuted a petition for *certiorari* to this court, and here assigned errors. The petition was granted, and the case was placed on the docket and fully argued by counsel.

The suit is based upon the following contract:

"It is agreed that Caruthers Ewing is to be employed to represent us and our interests in the matter of what is known as the 'Prohibition Act,' and he is to, in our behalf, or such person as we may name, contest the constitutionality thereof on the following terms:

Hotel v. Ewing.

"$1,250.00 to be paid in cash, from which he is to pay the expense incident thereto, in the way of stenographer's fees, printing briefs, etc., which is estimated at $250.00. His fee is to be $1,000.00 in the event the fight is unsuccessful. *In the event he succeeds in. suspending the enforcement or operation of the act until the meeting of the next supreme court in the spring of 1910, he is to be paid $4,000.00 additional.* In the event the fight is successful, and the act declared unconstitutional and defeated *in toto,* he is to be paid $9,000.00 additional.

"I agree to pay my *pro rata,* but not to exceed one-tenth of the above charges."

The portion of the contract on which the present suit is based is italicized by us for convenience of reference.

The only evidence introduced in the court below was that of Mr. Ewing himself. There were frequent breaks in the evidence, caused by objections made by counsel and arguments thereon, during the course of the hearing before the trial court. These matters we omit, and place the questions propounded to the witness, and his answers, in solid form, not using an asterisk or star, but a dash, to show the interruptions in the text. What we reproduce presents the full substance of his testimony.

"Q. Please state the reason why the employment was made, and the contract which was made, and all of the facts concerning it.—Q. Well, I don't mean the reason exactly, but the circumstances under which it was made. —A. The legislature had passed what is known as the 'extension of the four-mile law' so that, whisky was not

to be sold in Memphis, and on about the 25th to the 28th of June I was approached by Mr. Bert Parker and Mr. Sam Baumgarten, representing certain individuals and themselves, and was asked to go into the constitutionality of this law with reference to determining whether, in my opinion, it was a valid law. The law was to become operative on July 1, 1909, and therefore it was necessary to know in advance of that date whether they should close as soon after that as possible, their statement being that the closing and stopping of business would vitally injure them and cause all of these gentlemen great loss. I was asked on what terms I would do this work, and I told them that I would investigate the act, with a view of determining whether I could do anything, without any charge whatever, for if my work was not to accomplish anything I didn't want them to pay for it. That is a small matter.—The contract was presented to me, after working on this matter at very great length, and quitting everything else at their request because of its importance to them.—Well, I withdraw that statement. I spent three weeks, possibly, night and day, on it.—I concluded and believed that the act was unconstitutional, explaining, however, that it might be declared constitutional, because it was whisky legislation; that the courts look with a little more favor on that sort of legislation than they would on legislation having no moral purpose, but that I thought there was a good fighting chance, and that we would make the fight. The test case we were to make; that was

the original plan.   We got Mr. Ernest Miller to buy some whisky from a fellow and indict him, to raise the question of the constitutionality of the law.   Mr. Miller bought it, or said he had, and indicted the party, and I made a motion to quash the indictment, which was the proper legal way to raise the question I was employed to raise.   When that matter came up in the criminal court there was some technicality in the indictment; in other words, my motion could have been sustained and the constitutionality of the act not be decided.   Therefore the attorney-general, recognizing this was a test case, conceded the motion to quash was good and recommitted the test case in which we were interested to the grand jury.—Well, this took up considerable time, preparation, and study and work.   The grand jury didn't indict that man, but the attorney-general procured other indictments.   A number of the saloons had closed at first, but in view of the fight we were making some of them here and there, and those I represented were all open.  · The question then, we concluded, under my employment, would be determined by trying the cases in which indictments had been returned as the best way to test the case.   Then there were, I think, seven indictments, possibly more.—One of the signers of this paper was indicted; that is, Mr. Parker.  He was indicted, and that made a test case for us, and I went to court, I think, seven or eight times, ready for trial always, anxious for trial, and prepared for trial.   For one reason or another they continued the case, one time be-

cause a witness for the State was not there, and another time because the prohibitionists were negotiating to get them some lawyers to fight the questions out with me, and they couldn't raise the fee, or they didn't, and it went over a week to give them that time, and another time a lawyer was sick, but all in all I was up there either five or seven times, I forget which.—Well, this resistance and this fight, of course, put a stop to the enforcement of the law unless they could convict some one, and I was in court all of those times ready for trial, and we never could get them to try.. Maj. Wright had filed a bill for the manufacturers to test the validity of the manufacturers' act, which was a kindred law passed at the same time.—We concluded we could get our test made from the manufacturers' suit, because, if the supreme court would say that the retail liquor law was unconstitutioanl, that would be effective in the manufacturers' case. Thereupon I went to work and prepared a very elaborate brief on this act, which I was prepared to assail, and did assail it, and turned that over to Maj. Wright, who printed that part in his brief on the manufacturers' case. This was by agreement of the two gentlemen who had acted for all the signers of the contract, and it was under their instruction. Then I arranged with, or requested, Judge Beard, chief justice of the supreme court, to permit me to orally argue the act which I had been employed by this contract to assail, so that I could be heard on it, and I had prepared it at great length, and we felt it would be better for a man

who had from the outset been devoting himself to this act to present it to the supreme court, so that it would not just be passed without sufficient argument.—Judge Beard stated that he would give me this time, but that particular case went by the boards because the manufacturers' case had not been raised properly.—Well, I next took up, inasmuch as we could not get a trial on indictment where it would come up direct, I then took up the question of an injunction, and investigated that very fully, with a view of filing a bill to enjoin the enforcement of this act. It was then concluded—time had been passing along, and we had at each place been ready to fight, and the public was seemingly losing interest in the enforcement of the law, and we were preventing its being enforced, and had prevented its being made effective, and that was the thing we had started out to do—we then agreed to abandon the injunction, because we had accomplished what we had started out to do.—Thereupon the supreme court met in April, 1910. This contract recited that I was to prevent the enforcement of the law until the spring of 1910, and I took no steps about it until June, 1910. Then I demanded compensation under this contract, because, my claim being that I had done that which I had agreed to do, and for which they had agreed to pay me. All paid me except Mr. Max Miller, Mr. John Persica, and the Arlington Hotel.—Q. Now, Mr. Ewing, you stated that after the case which you had instituted to test the law was dropped by the State you took part in other cases of a similar kind? A.

Yes, sir. Q. At whose instance was that done? A. At the instance of Mr. Parker and Mr. Baumgarten, and then it was my own belief that I was employed to keep that law from being enforced and to test it, and that it was left with me as a lawyer to determine, in a large measure, how that was to be done, having in view the benefit to the men I represented. Q. State whether or not it was necessary, in order for you to carry out that contract, that it was done. A. It certainly was. I couldn't do anything else. Q. You stated the prosecution of these suits lagged? A. Yes. Q. When that stage was reached, were you given any instructions with reference to the matter by your employers? A. Yes; we discussed it; but my own conception and view was, and still is, 'Let sleeping dogs lie.' The thing was to carry it along, and not stir it up, and in that way I could accomplish for these gentlemen just as much as by making a successful fight; in other words, by keeping them open. I was constantly engaged in interviews and always ready.—Q. Do you know what their desire was with reference to the law? A. I knew what I was told to do, and that was to try to save them from this act.—Q. Do you know whether the defendant continued to run its barroom? A. It did.—Q. After the prosecution of the suit ceased, those people, who employed you wanted you to let it rest as long as it could? A. We worked it this way, or rather accomplished it this way. This started on July 1st, and these indictments came along in July, and it was very hot, and, of course,

I had to have an agreement with the court, because I couldn't leave, and let them take these cases up on me in my absence, and I wanted to go off, and after we continued here four or five weeks, I trying to get a trial and the other people for one reason or another continuing it, I asked the court in open court to either make the State try the cases or continue them as late into the fall as they could, and finally Judge Palmer set them for, I believe, November from some time in the summer, and stated that he would not try any whisky cases with me being absent from the city, and the whisky people then told me to stay away forever, and not to come back. That was the agreement under which I left the city.—A. I say that was the open court agreement with reference to the whisky cases. Being apprehensive that some person whom I did not represent would be convicted, it was an offer on my part to represent these gentlemen, and I agreed to try any case for anybody without charge to the individual defendant.—Q. I will ask you to state, Mr. Ewing, whether or not it would be possible, or whether or not it would be proper, to let the question be raised in some other case than this. A. The question raised in another case and decided would bind my case, just like it was my case. It was for that reason that I had to hold myself open for anybody's fight. Q. State whether or not you rendered every service required under the contract. A. I thought I had rendered every service, and more, for I have never stopped rendering them yet. Q. Did the defendant, or any party to the contract, call on you

to perform services under it which you have failed to perform?—A. No. Q. Mr. Ewing, I believe you stated that your dealings with the parties to this contract were all through Messrs. Baumgarten and Parker? A. Yes, sir; except Mr. Brinkley Snowden, whom I talked to frequently, and I also talked to Mr. Sambucetti, whom I saw on the street.—Q. State whether or not the law was suspended till the day mentioned. A. Yes, sir; and continued thereafter to be nonenforced, and the indictments which I undertook to defend under this contract are still pending, and I, of course, represent the defendant.—Q. Now, did you procure any injunction from any court in this suit suspending the enforcement of that act? A. No, sir. Q. Did you have any agreement with the public officers of this State that they would not enforce the act? A. No, sir. Q. Is not it a fact that the attorney-general of this county has announced the act is not enforcable and published it? A. I don't know it to be the fact, and I never saw the publication. I have generally heard that he said that he could not at this time enforce it. Q. All that you have done is that you have represented a defendant or several defendants in the criminal court, is it not? A. I am going to answer it, and then explain. I answer, No, that is not all I have done. Now I want to explain the answer. When this law went into effect on July 1st, it was very easy to enforce it, and it was perfectly plain to every officer, saloon keeper, lawyer, and citizen that it could then be enforced. I then represented the retail liquor dealers, and fought

it off until the summer, and got the matter delayed into the fall. Now, by holding out and resisting any enforcement for the first four or five months, then I claim I made it impossible for them to enforce it.—Q. Anyhow there was no trial in the criminal court in which you as counsel had this act declared illegal or unconstitutional? A. There never was. Q. You appeared as counsel and made a motion to quash an indictment that had been returned in the first case? A. Yes, sir; and that motion was sustained. Q. That was sustained, not on the ground that the act was unconstitutional? A. Not on that ground at all; it didn't get that far. Q. The indictment was quashed? A. Yes, sir. Q. No indictment was returned afterwards against any one of these parties, until late in the fall one was returned against Mr. Parker? A. You are mistaken about that. Q. I understand you to say that. A. I never made such a statement. On the contrary, I stated there were several indictments returned, which I got continued to the fall. Q. And there were none against any of the parties? A. I don't know what you mean by none of them. He was one of the parties. Q. I thought you said there was not. A. No; but I said Mr. Parker, whose name appears on there, was indicted five or seven times; enough to make it lively for us if we were mistaken. Q. His case has never been tried? A. It never has; I have been in court every time. Q. Now, Mr. Ewing, is not it a fact that the suspension of this law has been because the public sentiment of the community does not desire its enforcement? A. That is my

opinion now that that condition has brought this about, and I don't want to be understood as claiming that I was solely responsible for that law not being enforced; but I do claim that the liquor interest at that time thought they would have been put out of business, except that some lawyer as the head of the defensive fight be ready, prepared, and willing to go on with the fight, and at all times doing it. Now, that is what I claim; that I accomplished what I was employed to do and paid to do."

At the conclusion of the evidence the plaintiff below moved for a peremptory instruction, and the defendant below did the like. The trial judge sustained the motion of the plaintiff below, and overruled the motion of the defendant below. Thereupon the jury rendered a verdict pursuant to the instruction, and the defendant below prayed and prosecuted an appeal, as before stated.

The case must be determined really upon the face of the contract. We have reproduced the evidence, however, in order that Mr. Ewing's view may be fully presented, in his own language.

That portion of the contract on which the present suit is brought reads: "In the event he succeeds in suspending the enforcement or operation of the act until the meeting of the next supreme court in the spring of 1910, he is to be paid $4,000.00 additional."

We do not see how any one for a moment could conceive that a contract of this kind could be enforceable in a court. It is a contract to suspend, and thereby render nugatory, a criminal law of the State.

Such a contract is necessarily void, as are all contracts made with a view to the violation of a statute. Various illustrations of the principle will be found in the following cases: *Yerger* v. *Rains,* 4 Humph., 259; *Hale* v. *Henderson,* 4 Humph., 199; *Allen* v. *Dodd,* 4 Humph., 131, 40 Am. Dec., 632; *Isler* v. *Brunson,* 6 Humph., 278; *Lea* v. *Collins,* 4 Sneed, 393; *Nichols* v. *Cabe,* 3 Head, 92; *Parks* v. *McKamy,* 3 Head, 297; *Rhodes* v. *Summerhill,* 4 Heisk., 204; *Heart* v. *Brewing Co.,* 121 Tenn., 71, 113 S. W., 364, 19 L. R. A. (N. S.), 964, 130 Am. St. Rep., 753.

That the purpose was to nullify the statute above referred to is not only clear from the language which we have quoted, but the matter is plainly stated in the deposition of Mr. Ewing, in which he says that, having accomplished that result, he is entitled to recover the amount agreed to be paid; the suit being against the Arlington Hotel for its one-tenth of the sum agreed to be paid.

There is no means known to the law whereby the operation of a valid criminal statute can be legally suspended, or the enforcement thereof stayed. Such a statute cannot be enjoined. If parties be indicted under the statute, and they be defended this cannot legally stay its operation, since each additional offense under the statute is an additional crime, for which a new indictment may be framed, and for which a new prosecution may be waged.

Of course, every such prosecution might be defended, and upon conviction had there might be an appeal to the

supreme court, and here the question of constitutiontlity
could be finally tested.   It certainly would not be a vio-
lation of law for an attorney to defend every such suit,
or let it be known that he would defend every such suit,
and Mr. Ewing's evidence shows that this was substan-
tially all that he did; that is, that he let it be known that
he stood ready to defend all such cases, and did go to
court from time to time to make such defense, and did
spend much time in preparing himself on the questions
of law involved. These acts, of course, were not, in and
of themselves, illegal.   It is laid down, however, that if
a contract can by its terms be performed lawfully, it will
be. treated as legal, even if performed in an illegal
manner; while a contract entered into with intent to
violate the law is illegal, even if the parties may in per-
forming it depart from the contract, and keep within the
law.  1 Page on Contracts, section 506, p. 707.

As we have stated, there is no lawful means whereby
the operation of a valid criminal statute can be suspend-
ed.   As we have said, the purpose of this contract was
to effect such nullification of a valid law.   Therefore,
although such acts as were done by Mr. Ewing were, in
themselves, legal, yet, their purpose being to further and
promote an illegal contract, they could not be such acts
as the law would aid him in obtaining compensation for.
Moreover, he concedes in his deposition that these acts
were not wholly efficacious in bringing about the desired
result, but only contributed thereto.  He says: "Q.   All
that you have done is that you have represented a de-

fendant or several defendants in the criminal court, is not it?  A.  I am going to answer it, and then explain. I answer, No, that is not all I have done.  Now I want to explain the answer.  When this law went into effect on July 1st, it was very easy to enforce it, and it was perfectly plain to every officer, saloon keeper, lawyer, and citizen that it could then be enforced.  I then represented the retail liquor dealers, and fought it off until the summer, and got the matter delayed into the fall.  Now, by holding out and resisting any enforcement for the first four or five months, then I claim I made it impossible for them to enforce it. . . .  Q.  Now, Mr. Ewing, is not it a fact that the suspension of this law has been because the public sentiment of the community does not desire its enforcement?  A.  That is my opinion now that that condition has brought this about, and I don't want to be understood as claiming that I was solely responsible for the law not being enforced; but I do claim that the liquor interests at the time thought they would have been put out of business, except that some lawyer as the head of the defensive fight be ready, prepared, and willing to go on with the fight, and at all times doing it. Now, that is what I claim; that I accomplished what I was employed to do and paid to do."  The substance of which is that the obstructive tactics he employed contributed largely to the result, but the final state of anarchy upon this subject was brought about by the fact that the public sentiment in the city of Memphis was against the enforcement of the law.

.We do not wish to be understood as holding that a lawyer may not properly undertake to test the constitutionality of a criminal statute, that is in fact constitutional. Such contracts are often made. However, if, in addition to undertaking to test its constitutionality, he contracts that he will, pending such test, suspend or nullify its operation, the contract is void.

The court of civil appeals has treated this case as if Mr. Ewing were suing on a *quantum meruit*. This is an entire misconception of the suit. It is perfectly plain, from the warrant as well as from Mr. Ewing's deposition, that he himself had no such theory of the case, but that he regarded himself as suing on the contract, and he claimed a recovery on the ground that he had performed the contract.

We are of the opinion that the court of civil appeals erred in its judgment; likewise, the trial court.

The trial court should have granted the peremptory instruction asked by the defendant below.

Rendering such judgment as the trial court should have rendered, we sustain the motion made by the defendant below, and dismiss the suit, with costs.