WALKER STANSELL *v.* M. J. ROACH *et al.**

*(Nashville.* December Term, 1922.)

1. CONTRACTS.. Dangerous tendency of contract as to lobbying must appear from the face of the contract or be inferable.

A claim, in an action for services, that the contract under which the services were performed was invalid because it related to lobbying, and the passage of acts by Congress, should be heeded only when the contravention or the dangerous tendency of the contract clearly appears either from the face of the contract itself, or is necessarily inferable from the matters which are expressed therein. (*Post, pp.* 189-191.)

2. CONTRACTS. Not declared void for public policy except where free from doubt.

Courts will not declare contracts void on grounds of policy except in cases free from doubt, and a prejudice to the public interest must clearly appear. (*Post, pp.* 189-191.)

3. CONTRACTS.. Validity not rested upon unlawful means used.

Whether a contract relating to lobbying was void so that a recovery could not be had for services thereunder, is to be decided, not by what unlawful means may have been used to bring about a just and honest result, but whether by its terms it necessarily implied the use of unlawful means in its accomplishment. (*Post, p.* 191.)

Case cited and distinguished: Hotel v. Ewing, 124 Tenn., 550.

4. CONTRACTS. Law concerning contract dependent upon future legislative action.

The law guards the processes of legislation against improper in-

*On question of validity of contract for services to procure legislative action, generally, see notes in 30 L. R. A. 737; 4 L. R. A. (N. S.) 213.

fluences with jealous care, and will not lend its aid to the enforcement of any contract which expressly or impliedly contemplates the enjoyment of corrupt or otherwise improper methods to influence the official conduct of legislators; but it is not the law that all contracts dependent upon future legislative action are against the public policy, nor is it true that all contracts to secure legislative action are unenforceable. (*Post, pp.* 191-202.)

Cases cited and approved: Wylie v. Coxe, 15 How., 415; Wright v. Tebbitts, 91 U. S., 252; Stanton v. Embry, 93 U. S., 548; Taylor v. Bemiss, 110 U. S., 42; Nutt v. Knut, 200 U. S., 13; Hazelton v. Sheckells, 202 U. S., 71.

Cases cited and distinguished: Valdes v. Larrinaga, 233 U. S., 708; Marshall v. B. & O. R. R. Co., 16 How., 314.

5. **CONTRACTS.** Lobbying contract held not void and unenforceable.

Where one who himself has a just and meritorious claim against the government, which he can only be remunerated for by act of Congress, engages and contracts with others who have similar claims, based on the same situations, who represents them along with his representations of himself in an effort to secure favorable consideration thereof, his expenses and compensation to be dependent on his success, in which no questionable methods were mentioned and no immoral conduct actually resorted to, his contracts with the others for such contingent compensation are not void as in contravention of public policy. (*Post, p.* 202.)

6. **UNITED STATES.** Contract relating to obtaining passage of appropriation act not void assignment.

A contract whereby one, for contingent compensation, agreed to obtain passage of acts of Congress making appropriations to contractors who had lost money in government work was not void under Rev. St. U. S. section 3477 (U. S. Comp. St., section 6383), declaring void all transfers of any part of any claim against the United States or any interest therein; the contractors not having claims against the United States, and the one employed to

Stansell v. Roach.

obtain the appropriation having no right or interest directly or indirectly in the claim, and the government no longer being interested in the matter after having paid out the money. (*Post*, *pp*. 202, 203.)

Cases cited and approved: Price v. Forrest, 173 U. S., 410; Goodman v. Niblack, 102 U. S., 556; Hobbs v. McLean, 117 U. S., 567.

7. **LIENS.** Person contracting to obtain appropriation held not to have lien unless equitable.

A contract whereby one, for contingent compensation, agreed to obtain appropriations for government contractors who had lost money in government projects after the war *held* not to give a lien for the services to be rendered, unless an equitable lien to which Rev. St. U. S., section 3477 (U. S. Comp. St., section 6383), would afford no obstacle. (*Post*, *pp*. 203, 204.)

Case cited and approved: Fain v. Inman, 53 Tenn., 16.

8. **LIENS.** Equitable lien not based upon moral obligations.

An equitable lien cannot be based alone upon moral obligations, but there must be a basis established in equitable principles. (*Post*, *pp*. 204, 206.)

9. **LIENS.** Person obtaining appropriation from Congress not entitled to preference for services.

One who contracted to obtain passage of acts of Congress making appropriations to contractors who had lost money in government work *held* not entitled to an equitable preference out of the funds appropriated. (*Post*, *pp*. 204-206.)

Cases cited and approved: Brown & Reid v. Bigbee, 3 Ch. Rep.,—; Walker v. Brown, 165 U. S., 654.

10. **ATTORNEY AND CLIENT.** Not entitled to a lien on funds appropriated by Congress.

An attorney obtaining on contingent basis appropriations by Congress to contractors who had lost money in government work was not entitled to a lien on the funds appropriated merely by reason of his relation as an attorney at law. (*Post*, *pp*. 206-211.)

Case cited and approved: Trist v. Child, 21 Wall., 441; Valdes v. Larrinaga, 233 U. S., 708.
Cases cited and distinguished: Nutt v. Knut, 200 U. S., 13; Wylie v. Coxe, 15 Howe, 415.

## FROM SHELBY.

Appeal from the Chancery Court of Shelby County.— HON. F. H. HEISKELL, Chancellor.

HENRY CRAFT, for plaintiff.

FRANCIS FENTRESS, for defendants.

MR. L. D. SMITH, Special Justice, delivered the opinion of the Court.

The action presented in this record is one by the complainant to recover, for services performed by him for the deceased, Ramsey, in his lifetime, and for his administrator after his death, the sum stipulated in the contract under which services were performed. That there was a contract for the performance of the services, that the services were performed as stipulated, and that the value thereof was fixed at the amount stated in the bill, are not matters of dispute. Liability is contested on behalf of the creditors by the administrator *ad litem* alone upon the ground that the services contemplated and contracted for were those of lobbying to influence an appropriation by Congress to pay a claim in favor of the decedent against the United States government, and that the contract is inimical to sound public policy, and therefore without consideration and void and unenforceable.

Stansell v. Roach.

The cross-bill by the administrator *ad litem* seeks to recover amounts alleged to have been obtained by the complainant from funds derived out of the congressional appropriation procured by him for the deceased. The cross-bill necessarily fails if the contract be not unlawful, and it is contended by the complainant that it must fail if the contract is unlawful, for the reasons which prevent complainant from recovering on the original contract, and for other reasons.

The chancellor considered the contract illegal and dismissed both the bill and the cross-bill. Both parties appealed and assigned errors here.

The terms of the contract are not in dispute, and can be best understood by their recital in connection with the situation of the parties and circumstances under which they contracted:

The complainant, Stansell, was a partner in the firm of Roach, Stansell, Lowrance Bros. & Co., who in 1917 entered into contracts with the United States government for doing a large amount of work on levees along the Mississippi river. Ramsey had subcontracted some of the work of this firm and some work under another contractor named Blanks. These contracts with the government to do this levee work were entered into and undertaken about the time of the declaration of war in 1917. The contractors were delayed in the execution of their work by reason of the government taking over the equipment, labor, etc., and devoting them to more urgent war preparations, such as were being conducted at the powder plants at Nashville, Sheffield, and other places. It was not until after the Armistice that these contractors could carry out their operations. It was then manifest that the carrying out of

these contracts would result in great loss to the contractors. Being unable to obtain any concessions on account thereof from the government officials, they proceeded to complete their contracts, and, as a result of the great difference in prices of labor and material, and the increase in the cost far beyond the estimates upon which the contracts were based, they lost large sums of money. Ramsey's capital and properties were exhausted and all of the contractors were threatened with bankruptcy. The contractors considered the question of making an effort to obtain relief through Congress. Ramsey and Stansell, with this in mind, went to Washington and placed their situation before Senator McKellar, whose constituents they were, and sought his advice as to the proper method of procedure to obtain relief from the government against their losses. On this visit to Washington they learned that an act or appropriation by Congress would be necessary, and that this would involve a long drawn out investigation, an expensive process, without any assurance of success. Great difficulty was anticipated in being able, especially in view of the fact that there were a very large number of claims pending before Congress, to get a consideration of their claims upon the merits. Mr. Ramsey was financially unable to enter into and prosecute the necessary procedure. He was not so familiar with the business nor so well qualified as Mr. Stansell, so that he suggested that Stansell look after his claim along with his own and the other contractors who had lost so heavily. Upon their return to Memphis a meeting of the contractors was held, and by all of them it was agreed that an effort should be made to get the merits of their claims before Congress, and an act passed appropriating money to cover their losses. Mr.

Stansell was to be paid for his services, his expenses and ten per cent. in amount of whatever appropriation might be obtained, each contractor to contribute thereto in proportion to the benefits secured. In the event nothing was secured, nothing was to be paid. The claims were manifestly just, and the only remedy open to the claimants was an appropriation by Congress. It had been explained that it would be necessary to secure favorable action from the Commerce Committee in order to get an order from the Secretary of War directing an audit of the books of the contractors, have favorable consideration of the claims committees of the Senate and of the House, and, of course, a favorable vote by the Congress itself. The contractors understood that they would have the active assistance of Senator McKellar and Congressman Fisher, of the Memphis district. There was nothing whatever said or suggested in connection with this contract that Mr. Stansell was to engage in any conduct smacking of lobbying in the offensive sense of that word, nor anything else more than to present the merits of the claims in such way as that they would receive favorable recognition.

It is not contended that there was in fact anything in the contract expressly providing for any improper service in connection with these claims, but the contention is that such must necessarily be implied from the fact that the compensation contracted for was contingent upon success. We have a case, therefore, where one who himself has a just and meritorious claim against the government which he can only be remunerated for by act of the Congress, who engages and contracts with others who have similar claims, based upon the same situations, to represent them along with his representations of himself in an effort to

secure favorable consideration thereof, his expenses and compensation to be dependent on his success, in which no questionable methods were mentioned, and no immoral conduct actually resorted to, in which no misrepresentation was necessary in order to engage favorable consideration, and in which the agent employed would necessarily be known to have a personal interest in the appropriation; a case in which intelligent, efficient, and honorable efforts resulted in success, whereby Ramsey's creditors, who are resisting his suit for compensation, are enabled to collect anything on Ramsey's indebtedness to them, and, although they would have received nothing but for the complainant's services, they maintain that he should receive no compensation because the contract necessarily contemplated, in order to accomplish success, unlawful practices would be engaged in. They urge most strongly the public policy of protecting the public from methods such as have resulted in their benefit. This they have the legal right to do, and they are not criticized for doing so, but the facts mentioned serve to remind us the power of the court to heed their urging is a delicate one, to be exercised only when the contravention or the dangerous tendency of the contract clearly appears either from the face of the contract itself or is necessarily inferable from the matters which are expressed therein. This is elemental in the law of contracts. The rule has been aptly stated thus:

"Courts will not declare contracts void on grounds of public policy except in cases free from doubt; a prejudice to the public interest must clearly appear before a court is justified in pronouncing a contract void on that account."

Sir James Burroughs is reported as having said: "I protest as my lord has done, against urging too strongly upon public policy; it is a very unruly horse, and when once you get astride it you never know where it will carry you. It may lead you from the sound law. It is never urged at all but when other points fail."

On the other hand, in proper cases, the courts will not hesitate, from motives of preserving to men of full age and competent understanding the right and liberty of contracting as they choose, to declare void contracts which contravene sound public policy, even though, as in this case, the rule is invoked by those who but for the legality of the contract would have no occasion to invoke it.

Fortunately we may not go far astray in the performance of this delicate duty by reason of illustrious precedent where other similar situations have been presented to distinguished courts of this country.

This contract is to be decided, not by what unlawful means may have been used to bring about a just and honest result, but whether by its terms it necessarily implies the use of unlawful means in its accomplishment. This court said in *Hotel* v. *Ewing,* 124 Tenn., 550, 138 S. W., 957, 38 L. R. A. (N. S.), 842, Ann. Cas. 1913A, 121:

"It is laid down, . . . that if a contract can by its terms be performed lawfully, it will be treated as legal, even if performed in an illegal manner; while a contract entered into with intent to violate the law is illegal, even if the parties may' in performing it depart from the contract, and keep within the law. 1 Page on Contracts, section 506, page 707."

As applied to a situation like the one here presented, the rule is well stated in 2 Ruling Case Law, p. 1041:

"In contracts between attorneys and clients the usual test would seem to apply that if a contract can by its terms be performed lawfully, it will be treated as legal, even if performed in an illegal manner; while, on the other hand, a contract entered into with intent to violate the law is illegal, even if the parties may, in performing it, depart from the contract and keep within the law."

In 6 R. C. L. p. 731, the author has correctly deduced the rule to be: "It is unquestionably true that an agreement based on services to be rendered by an agent or attorney, the tendency of which would be to unduly influence or corrupt legislation, is against public policy, and cannot be enforced. It is not the law that all contracts dependent upon future legislative action are against public policy, nor is it true that all contracts to secure legislative action are unenforceable. It is correct to say that the law guards the processes of legislation against improper influences with jealous care, and will not lend its aid to the enforcement of any contract which expressly or impliedly contemplates the employment of corrupt or otherwise improper methods to influence the official conduct of legislators, or others charged with public duty. But it would be a perversion of this salutary rule to say that it forbids all efforts of interested persons or classes to secure the adoption of desired legislative measures. The courts do not condemn the attempts to secure legislation for legitimate purposes and in a legitimate manner."

The only provision in the contract in question here relied upon as showing an intention to unduly influence legislation is that which makes the compensation of complainant contingent upon success. This contention is based upon the asserted proposition that—"The courts

should not enforce a contract under which the plaintiff voluntarily acquired a pecuniary interest in the result of legislative investigation, which might subject not only him, but, through him, others, to the temptations and allurements which human experience has proved to be potent in sacrificing sound morality and honesty to that greed and cupidity which not infrequently beget perjury, bribery, and other moral delinquency incompatible with the public weal." 6 R. C. L., p. 732.

Upon this principle it is insisted that any contract the probable tendency of which would be to sully the probity or mislead the judgment of those to whom the high trust of legislation is confided must be pronounced void, and that such tendency must necessarily be inferred from an agreement to pay and to receive contingent compensation.

We entirely agree with the soundness of the proposition that a contract which necessarily implies the exercise of an improper or undue influence upon legislation should be declared void and unenforceable out of consideration of a sound public policy, but we are unable to concur in the conclusion that such a situation is inferable from the mere provisions for contingent compensation. The terms of a contract may be broad enough and used in connection with circumstances and in such a way as to imply secret or dishonest services, and such a law falls within the condemnation of public policy.

"But as the law does not presume that a person intends to violate its provisions, the general principle controlling the construction of a contract to influence legislation when the contract itself does not in terms stipulate for improper means seems to be that it will be upheld, unless the use of such means appears by necessary implication. The test

146 Tenn.—13

is, does the contract, by its terms or by necessary implication, require the performance of acts which are of a corrupt character or which have a corrupting tendency." 6 R. C. L., pp. 732, 733.

Numerous cases might be cited where the courts have upheld contracts for service in which compensation was contingent upon success. Reference to a few will suffice to show that the mere fact of contingency does not of itself vitiate the contract. A leading case which has been recognized and followed in numerous decisions by the supreme court of the United States is *Wylie* v. *Coxe,* 15 How., 415, 14 L. Ed., 753. In that case one Baldwin was employed to prosecute a claim for one Cox, growing out of loss of property and personal outrages through the officers of the Mexican Republic, a treaty of peace between the United States and Mexico having made provision for the settlement of such claims, and Congress having passed an act authorizing a board of commissioners to examine and decide such claims. Under Baldwin's contract he was to receive a contingent fee of five per cent. out of the money awarded, whether money or scrip. If nothing was received he was entitled to nothing for his services. There was no suggestion in the opinion of the court that this contingent fee in any way affected the complainant's right to recover. There was, of course, no intimation that any improper conduct had been resorted to, and in sustaining the complainant's claim the court said:

"We think the contract is, proved, also the services rendered under it, by the complainant, and that he is entitled to the compensation claimed."

It is said by counsel for the defendant that the case just referred to is one of the recognized cases of pure profes-

sional services. That is unquestionably true, but this and the other similar cases emphasize the rule that contingency in the compensation for services contained in an agreement does not of itself vitiate the contract, nor does it necessarily involve the implication of undue influence. *Wright* v. *Tebbitts,* 91 U. S., 252, 23 L. Ed., 320; *Stanton* v. *Embry,* 93 U. S., 548, 23 L. Ed., 983; *Taylor* v. *Bemiss,* 110 U. S., 42, 3 Sup. Ct., 441, 28 L. Ed., 64. The reason for upholding the validity of such contracts was stated by Mr. Justice MILLER in the case just cited. He said:

"The well-known difficulties and delays in obtaining payment of just claims which are not within the ordinary course of procedure of the auditing officers of the government, justifies a liberal compensation in successful cases, where none is to be received in case of failure. Any other rule would work much hardship in cases of creditors of small means residing far from the seat of government who can give neither money nor personal attention to securing their rights.

In *Nutt* v. *Knut,* 200 U. S., 13, 26 Sup. Ct., 216, 50 L. Ed., 348, the agreement provided that the claimant was to take exclusive charge and control of a certain claim which the defendant had against the government of the United States, the claim being for the use of property which the defendant and his estate was deprived of by the acts of officers and soldiers of the United States, complainant's obligation being to prosecute "before any of the courts of the United States, and upon appeal to the supreme court of the United States, or before any of the departments of government, or before the Congress of the United States, or before any officer or commission or convention specially authorized to take cognizance of the claim, or through any

diplomatic negotiations as may be deemed by him for the best interests of the party of the second part." The agreement provided as compensation for the complainant's services "a sum equal to thirty-three and one-third per cent. of the amount which may be allowed on said claim." The service was performed, and as a result of his labor Congress at different times appropriated on these claims more than $100,000. With respect to the contention made therein that the contract was void and against public policy, the court said: .

"Much was said in argument as to the nature of the services rendered by the [complainant], the charge being that his services were of the kind called lobby services for which, consistently with public policy and public morals, no recovery could be had in any court. . . . We have seen that the State court of original jurisdiction was of opinion the suit was for lobbying services, and on that ground denied all relief. But the supreme court of Mississippi, held that the record did not establish such a case, and we accept that view of the evidence in the cause."

That the contract did provide for contingent compensation in this case there was no question nor doubt, but, as we have seen, it was held that this was not sufficient to denounce the contract as one calling for lobby service.

In the case of *Valdes* v. *Larrinaga*, 233 U. S., 708, 34 Sup. Ct., 750, 58 L. Ed., 1163, Valdes was a riparian owner, and desired a water franchise from the Porto Rican government, and he entered into a contract with Larrinaga by which the latter was employed to help him "in getting it through," and in all the rest in connection with said franchise, such as plans, projects, and everything concerning technical plans thereof, upon a contingent interest of

Stansell v. Roach.

ten per cent. in the profits.  It was contended energetically, says Mr. Justice HOLMES in his opinion, the contract was against public policy, with respect to which the opinion proceeds:

"We shall not speculate nicely as to exactly what the law was in Porto Rico at the time the contract was made, but shall give the complainant the benefit of the defenses upon which he relies, such as *Hazelton* v. *Sheckells,* 202 U. S., 71.  But we discover nothing in the language of the letters that necessarily imports, or even persuasively suggests, any improper intent or dangerous tendency.  Larrinaga had ceased to be assistant secretary, and while in that position had refused to take part in the plan.  His answer, which must control if there is any difference, as the parties went ahead on it,  .  .  .   binds him to help in the steps to be gone through, and in the technical part. If his help in the steps to be gone through was not to be, like the rest of his work, in the technical part alone, still there is nothing to indicate that it is of a kind that it could not be stipulated for.  In view of the subject-matter, a grant, it would seem to a riparian owner, of the right to use water power for public service, the things done, such as joining in an application to the military governor for a franchise on the footing of a joint interest, or helping to present it to the secretary of war when it came up to him, or preparing plans and specifications to be presented to the executive council of Porto Rico when the first franchise granted by the secretary of war had been lost by not complying with its terms, have no sinister smack.  We see nothing to control the decision of the district judge that the contract was not against the policy of the law."

It is to be observed that the supreme court, notwithstanding this contract provided for services in connection with urging the granting of a franchise by legislative council for a contingent compensation, says:

"We discover nothing  . . .. that necessarily imports, or even persuasively suggests any improper intent or dangerous tendency."

We· are directed by counsel for the defendant to the case of *Marshall* v. *B. & O. R. R. Co.,* 16 How., 314, 14 L. Ed., 953, as authority for the proposition that all contracts for a contingent compensation for obtaining legislation are void by the policy of the law.  If we may take segregated excerpts from the opinion of the court in that case, a basis for the defendant's argument will be found but, when considered as a whole, the case does not justify the conclusion relied upon.  We find from an examination of that case a complainant who was suing for compensation for services who was a professional lobbyist. His contract called for secrecy in his employment, as well as in his compensation.  The correspondence leading up to his employment shows that he contemplated the use of personal influence regardless of the merits of the legislation he was proposing to obtain.  The legislation was of a character the propriety of which was very much disputed, and one with respect to which much legislative lobbying had previously been engaged in.  Questionable methods had been employed to defeat the legislation, and this gentleman proposed to fight the devil with fire.·  It was with respect to contracts of this sort that the court held competent as evidence the communications of the gentleman setting forth the methods which he proposed to use, and in which the court said:

"That all contracts for a contingent compensation for obtaining legislation, or to use personal or any secret or sinister influence on legislators, is void by the policy of the law. . . . Secrecy, as to the character under which the agent or solicitor acts tends to deception, and is immoral and fraudulent; and where an agent contracts to use secret influences, or voluntarily, without contract with his principal, uses such means, he cannot have the assistance of a court to recover compensation. That what, in the technical vocabulary of politicians, is termed 'log-rolling,' is a misdemeanor at common law, punishable by indictment."

The contract in that case involved all of the elements denounced by the language just quoted. There was not only a contingent fee, but there was an agreement for secrecy, personal and sinister influences, and withholding upon the part of the agent of the capacity in which he urged this legislation and of the fact that he was at all interested in it. The opinion of the court in that case concedes that persons whose interests may be affected by act of the legislature have an undoubted right to urge their claims and arguments, either in person or by counsel by the legislature itself, as well as in courts, and it was said:

"But where persons act as counsel, agent, or in any representative capacity, it is due to those before whom they plead . . . that they should honestly appear in their true characters, so that their arguments and representations, openly and candidly made, may receive their just weight and consideration. A hired advocate or agent, assuming to act in a different character, is practicing deceit on the legislature. Advice or information flowing from the unbiased judgment of disinterested persons, will nat-

Stansell v. Roach.

urally be received with more confidence and less scrupulously examined than where the recommendations are known to be the result of pecuniary interest, or the arguments prompted and pressed by hope of a large contingent reward, and the agent 'stimulated to active partisanship by the strong lure of high profit.' Any attempts to deceive persons intrusted with the high functions of legislation, by secret combinations, or to create or bring into operation undue influences of any kind, have all the injurious effects of a direct fraud on the public."

In this language we have a correct, accurate and full statement of the nature and character of action which enter into contracts constituting "lobbying," denounced as vitiating and depriving the agent of the right to recover compensation. The contract therein held to be void is akin to the one involved in this case only in the provision for a contingent fee, which, as we have seen, is not of itself sufficient to denounce it. Contingency of compensation may well be a circumstance in the construction of the contract to determine whether any improper service is contemplated by the parties. In the case at bar the agent was not a hired lobbyist, but was himself a claimant who had personal interest in the claims for which he sought legislation. It could not have been contemplated by the parties that it was expected that there existed any possibility of his being able to deceive any committee or congressman by any representation of being disinterested in the matter. His claim and those of the other contractors whom he represented were honest and just claims. There was and could be no impropriety in his presenting the claims of himself and his associates to the senator and congressman

who represented his immediate territory. There could be no impropriety in his laying before the committees of Congress the merits of his claim, the urgency of its allowance; neither could there be any impropriety in his advocacy of the merits of his claims to individual congressmen. Congress is not like a court where all claims are considered upon their merits when properly presented, but it is composed of two branches and very many members; its business is conducted through committees whose attention must necessarily be called to claims of this character by individual congressmen. A claimant has no possibility of appearing by himself or by counsel before Congress itself. He can only reach Congress through the committees, and only by much diligence and the assistance of individual congressmen who have had the inclination and time to investigate a claim can he hope to be heard before a committee. There certainly can be no impropriety in seeking opportunity to be heard by members of Congress, whatever may be said as to the propriety of the methods adopted in this instance to become acquainted with congressmen and to find an opportunity to present the claims to them. There is nothing in the circumstances of this case to indicate that it was within the contemplation of the parties to engage in any improper methods.

There are other cases than that of *Marshall* v. *B. & O. R. R. Co.*, above referred to, in which contracts similar thereto have been denounced. An examination of them shows that in every instance there was embraced in the contract language indicating and expressed under circumstances and conditions from which it must be inferred that the parties intended to use some covert pretense, or exercise some personal influence independent of the merits of the

Stansell v. Roach.

claim, or some such thing as is denounced in the leading case referred to.

Under the authorities and reasons which we have expressed, and with respect to which much more might be said, we are unable to agree that this case presents a situation wherein the court ought to declare nonenforcement of the contract on grounds of public policy, whereby creditors may escape payment of compensation for services which procured for them the very means which affords them an opportunity to question the validity of the contract. There is no such intendment in the contract as to justify the implication that the parties stipulated for performance of any illegal or improper services and there was nothing done from which we can infer any improper intention in the making of this contract. It results, therefore, that the complainant's claim must be allowed and the cross-bill dismissed.

The complainant Stansell claims a preference over the other creditors for payment out of the funds appropriated by Congress, upon the theory of equitable lien. This claim is resisted upon two grounds: First, it is contended by the defendant that the enforcement of a lien would be in violation of the statutes of the United States, revised section 3477 (U. S. Comp. St., section 6383), which declares that all transfers of any part of any claim against the United States, or any interest therein, whether absolute or conditional, shall be absolutely null and void, unless executed in the presence of at least two attesting witnesses after the allowance of such claim, the ascertainment of the amount due, and the issuing of a warrant therefor. From an examination of the statute and a consideration of the nature of the claim, it is quite evident that this defense

against the lien is not sound. The statute was passed for the protection of the government, and in order that it might not be harrassed by multiplying the number of persons with whom it had to deal. The statute has to do with the assignment and transfer of claims against the government. There was in fact no claim against the government of any legal nature or demand. Congress merely made appropriation by legislative act directly in favor of Ramsey, and the money was paid direct from the treasury to him. By the contract Stansell had no right or interest directly or indirectly in the claim, and the government having paid out the money was no longer thereafter interested in the matter, and the statute could not possibly have any application. The situation falls directly within the decisions of the supreme court of the United States dealing with this subject. *Price* v. *Forrest,* 173 U. S., 410, 19 Sup. Ct., 434, 43 L. Ed., 749; *Goodman* v. *Niblack,* 102 U. S., 556, 26 L. Ed., 229; *Hobbs* v. *McLean,* 117 U. S., 567, 6 Sup. Ct., 870, 29 L. Ed., 940.

Whatever may be said upon the question of whether Stansell can now assert a preference over the other creditors, it is certain that he never had any such a right in the claim or the fund which he could have asserted independently of the statute while the fund was in the hands of the government. It was not such a lien as attached to the fund itself. Whether a lien can now be set up in equity by virtue of the circumstances is another question. It is certain it had no existence prior to the effort made in this proceeding to assert it. It can stand no higher than the lien of the vendor who had not contracted in his deed for a lien for the purchase money. *Fain* v. *Inman,* 6 Heisk., 16, 19 Am. Rep., 577. A lien does not arise out of any inter-

est which the lienor had in the fund or out of any contract by which he was to receive a portion of the fund, but, if the lien attaches to the fund at all, it is by virtue of the principles of equity to be applied when the same is asserted. We think, therefore, it is quite clear that the statute affords no obstacle to the assertion of the lien.

A more difficult question is whether the situation of the parties entitles the complainant to an equitable preference out of the funds. It may be conceded that but for the services of complainant Congress would not have made the appropriation. We do not understand that an equitable lien can be based alone upon moral obligations, but it must find that basis in established equitable principles. While it is quite true, as stated by Chancellor COOPER in *Brown & Reid* v. *Bigbee,* 3 Chancery Reports, the inclination of the courts of this country, and of none more so than those of this State, has been to enlarge the doctrine of equitable liens and charges, with a view to the attainment of the ends of justice, without much respect for the technical restrictions of the common law. Nevertheless, we must find as a basis therefor some recognized principle. The only theory of equity advanced is that the services of Stansell produced the fund, and that under his contract he looked to the fund alone for compensation, and not to any obligation of his principal in person. We think neither of these propositions is maintainable. In the first place, Stansell did not produce the fund. It came by virtue of an appropriation by Congress. It may be quite true —and we think it is—that Stansell rendered valuable services but for which Congress would not have been moved to act. Still it cannot be said that the fund was procured by an individual in such a sense as to give him any equi-

table right to any portion thereof. In the next place, the evidence does not show that Stansell looked to the fund alone for his compensation, nor, indeed, that he was to have any part of the fund. His contract was, in the event Congress made the appropriation, he was to be paid for his services in connection with bringing it to the attention of Congress his expenses and ten per cent. of the amount of the appropriation. He was not to receive a part of the appropriation itself. It is true whether he received anything depended upon the appropriation being made, but this is only a means for arriving at the amount which he was to be paid. The witnesses who testify with respect to the contract use this language:

"We all agreed we would pay Mr. Stansell ten per cent. of the amount which he succeeded in getting the government to pay, and in addition each pay his proportionate part of the expenses incurred by him."

If the contract be construed so as to mean that the appropriation itself should be set apart for Stansell's services, it would come dangerously near violating the statute prohibiting the transfer of claims against the United States. The lien cannot be based upon an express executory agreement whereby an intention is indicated to make some particular property or fund security for a debt, for the reason there was no such express contract. Neither is it necessarily implied from the terms of the agreement. The rule of law seems to be that an agreement of that sort must be either expressed or necessarily implied without any reliance upon the person responsible or the owner of the claim of which the fund was the result. *Walker* v. *Brown*, 165 U. S., 654, 17 Sup. Ct., 453, 41 L. Ed., 865. An equitable lien does not necessarily involve a right which is

the basis of a possessory action in the thing itself, but it must be a right over the thing itself. Pom. (4th Ed.), section 165. It does not follow simply because the agent renders a valuable service enabling his principal to obtain his own.

It is contended by Stansell's counsel that he stands in the same situation as an attorney at law. Conceding this to be true, his right to the lien does not follow. An attorney may be entitled to assert a lien upon a judgment which he has represented his client in obtaining, but a principal basis for allowing a lien to an attorney at law is that it is deemed both natural and wise that the lawyer be secured in the fruits of his professional labor, since the proper administration of justice is essential to the well-being of the public, which cannot be secured without an intelligent and prosperous bar. *Brown & Reid* v. *Bigbee,* supra. Usually where the services of an attorney have been recognized as an equitable lien, the services have been performed in connection with court proceedings, and judgment has been obtained in favor of his client. An attorney for a defendant, however great the value of his services, and however much property he may have enabled his client to save, has no lien on his client's property by virtue of equitable principles.

On principle we are of the opinion that there exists no equitable reason for preference in favor of the complainant over the other creditors. We have been referred to no case in our jurisdiction deciding the question one way or the other. The view expressed finds authority in the case of *Trist* v. *Child,* 21 Wall., 441, 22 L. Ed., 623. In that case Trist had a claim against the United States for his services touching the treaty of Guadaloupe Hidalgo. He

made an agreement with Child to take charge of the claim and prosecute it as his agent and attorney, especially in the submission thereof to Congress. Congress appropriated a sum to the payment of this claim. Payment being refused, suit was brought and the attorney obtained a decree enjoining Trist from receiving any of the money appropriated from the Treasury until he should have paid the demand, the bill proceeding upon the idea that there was a lien in favor of the complainant on the fund appropriated resulting from the contract. It is said by the court that a lien such as was named was within the prohibition of the statute to which we have referred declaring transfers of any interest in the claim null and void unless executed in the presence of witnesses after the allowance of the claim and the ascertainment of the amount due. The court said:

"That the claim set up in the bill to a specific part of the money appropriated is within this statute is too clear to admit of doubt. It would be a waste of time to discuss the subject."

Claim to a lien was denied upon the equitable principle stated that a mere agreement to pay a debt out of such fund is not sufficient, but there must be an appropriation of the fund *pro tanto* either by giving an order or by transferring it otherwise in such manner that the latter is authorized to pay the amount directly to the claimant without the further intervention of the debtor. In the case of *Nutt* v. *Knut,* 200 U. S., 13, 26 Sup. Ct., 216, 50 L. Ed., 348, there was an agreement between the claimant and his attorney by which the latter was to prosecute a claim against the United States for property used and of which he was deprived by United States officers, amounting to $1,000,000, in consideration of which the claimant was to

pay "a sum equal to thirty-three and one-third per cent.
of the amount which may be allowed on said claim, the
payment of which is hereby. made a lien upon said claim."
The court held that, in so far as the contract undertook
to create a lien, it was violative of the statute of the
United States which rendered it unlawful to assign or
transfer any claim against the government. The claim
itself was allowed independently of the lien. The attorney
was not allowed to recover in the court below upon the
ground that the contract violated this statute, but the su-
preme court said:

"It does not follow . . . that, for this error, the
judgment must be reversed" as "there is a provision in the
contract of 1882 which can stand alone and which was not
in violation of the statute, namely,' the one evidencing the
agreement on the part of Nutt's executors to pay to the
attorney for his services a sum equal to thirty-three and
one-third per cent. of the amount allowed on the claim.
. . . Such an agreement did not give the attorney any
interest or share in the claim itself nor any interest in the
particular money paid over to the claimant by the gov-
ernment. It only established an agreed basis for any set-
tlement that might be made, after the allowance and pay-
ment of the claim, as to the attorney's compensation. It
simply created a legal obligation upon the part of the
estate which, if not recognized after the collection of the
money, could have been enforced by suit for the benefit of
the attorney, without doing. violence to the statute or to
the public policy established by its provisions. The de-
cree below may then be regarded as only giving effect to
the agreement as to the basis upon which the attorney's
compensation was to be calculated. It did not assume to

give him any lien upon the claim or any priority in the distribution of the money received by Nutt's personal rep-resentative from the United States, nor upon any other money in his hands."

The claim here falls within the class of the decisions of *Trist* v. *Child* and *Nutt* v. *Knut,* denying the lien, since there was no contract either express or implied by which the attorney was to have any part of the recovery itself. There are cases decided by the supreme court of the United States in which an equitable lien was allowed, but in those cases it appeared that the attorney had contracted for an interest in the fund independently of any personal obligation of the claimant to pay, or there existed reasons for equitable interference. *Wylie* v. *Coxe,* 15 Howe., 415, 14 L. Ed., 753. Under the contract in that case the attorney was to receive a commission of five per cent. on the sum awarded for his services. There was no discussion in that case of the doctrine of equitable liens. No controversy appears to have arisen as to preference between the attorney and other creditors out of the particular fund, and the court concluded by saying :

"It is admitted that the complainant, by his explanations and arguments, removes difficulties and objections which, unexplained, would in all probability prevent the allowance of the claim. We think the contract is proved, and also the services rendered under it, by the complainant, and that he is entitled to the compensation claimed."

There was objection made that equity had no jurisdiction on the ground that adequate relief could be obtained at law. With respect to this objection, the court merely said :

"The evidence proves that the complainant was to receive a contingent fee of five per centum, out of the fund award-

147 Tenn.—14

ed, whether money or scrip. This being the contract, it constituted a lien upon the fund, whether it should be money or scrip. The fund was looked to and not the personal responsibility of the owner of the claim. A bill filed under the act would have authorized an injunction for the amount claimed, by complainant. Such a procedure would be within the act. But under the contract the lien on the fund in the hands of the administrator, is a sufficient ground for an equity jurisdiction. The payment of the fund to the executrix in Mexico would place it, probably, beyond the reach of the complainant."

In *Valdes* v. *Larrinaga,* 233 U. S., 708, 34 Sup. Ct., 750, 58 L. Ed., 1163, the complainant had a contract for ten per cent. of the profits which were to be obtained out of a concession which he paid the defendant to procure, thus evidencing that the contract was not for any personal obligation of the claimant but an interest in the profits themselves. It was objected that this did not present a case for equitable relief, but the court said the contract "gave the appellee an equitable interest in the concession to the extent of securing his share of the profits, if any, and attached to these profits specifically if and when they came into being. . . . It established a fiduciary relation between Valdes, who had legal control, and the plaintiff. The bill alleges an abuse of the relation by a secret transaction from which it is alleged that the profits accrued. It is a proper case for equitable relief."

The cases referred to point out the distinction which we have applied in accordance with good reason and sound principles wherein in cases of this sort an equitable lien may be asserted, with the result that the complainant is entitled

Stansell v. Roach.

to no lien or to have no preference over the other creditors in the distribution of this particular fund.

The decree of the chancellor will be modified so as to allow the claim of the complainant in full without any preference in his favor over the other creditors of the estate. The costs in the case will be paid by the administrator and the cause remanded in order that it may be proceeded with consistently with this opinion.