DRAUGHON *et al. v.* FOX-PELLETIER CORPORATION.

(*Nashville*, December Term, 1938.)

Opinion filed April 1, 1939.

Keeble & Keeble, of Nashville, for plaintiff in error.

Frazer & Clifton, of Memphis, for defendant in error.

Mr. Justice Chambliss delivered the opinion of the Court.

This is an action to recover on a written contract brought by J. V. Draughon, individually, and Draughon Fire Department, Inc. (hereinafter called Draughon), against Fox-Pelletier Corporation (hereinafter called Fox Corporation), having associates in the various cities of the world, with its principal office at Memphis, and a branch office in Nashville.

Draughon established some years ago a business at Belle Meade, a suburb of Nashville, of furnishing fire protection to all residents who made contracts therefor, and, as an incident thereof, agreed that he would furnish police protection to his patrons without additional charge. This was a going business and had become valuable at

the time the contract sued on was entered into with Fox Corporation, providing for the operation of a police patrol at Belle Meade. Fox Corporation was influenced in contracting with Draughon and establishing a business at Belle Meade, by the Sheriff of Davidson County, who had seen its uniformed policemen used by the Fox Corporation in a private police patrol in a suburb of Memphis. The Sheriff suggested to Mr. Fox, President of Fox Corporation, that he establish such a patrol in Belle Meade, as his office had complaints from Belle Meade, and he did not have deputies to take care of this section.

In March, 1933, Mr. Fox and Mr. Pelletier, officers of the Fox Corporation, came to Nashville and took the matter up with the Sheriff, who introduced them to Mr. Draughon and told them that any agreement they made between themselves would be satisfactory to him.

A written agreement was entered into between the parties on March 28, 1933, which recited, in substance, that Draughon had been operating a private police patrol in Belle Meade and adjoining territory under the authority of the Sheriff of Davidson County—Draughon holding a commission as a deputy sheriff—and through his operation of said business had obtained the confidence and good-will of the residents of Belle Meade and adjoining territory; that the Fox Corporation desired to operate in Belle Meade a private police patrol and desired to purchase the good-will of Draughon; that Belle Meade section was not large enough to support more than one private police patrol. It was then provided that the Fox Corporation agreed, in consideration of the premises, to pay Draughon the sum of $150 monthly, as long as Fox Corporation operated its patrols in the Belle Meade section and adjoining territory, but that the lia-

bility of the Fox Corporation for such payments should cease if Draughon removed his residence from Davidson County. The Fox Corporation was given the right to locate and maintain its headquarters in the Draughon Fire Department hall, have desk room, use its telephones and have space for one automobile; and it was provided that should the Fox Corporation voluntarily remove its headquarters from said place, the payment of the $150 per month should continue at the same rate, but that if the Fox Corporation should be forced to secure headquarters elsewhere, due to the inability of Draughon to furnish it space, it should pay from that date only $112.50 per month.

It was further agreed that Draughon should discontinue the operation of his police service, except that he should retain his commission as deputy sheriff, and might continue to render individual police service to such subscribers to the Fire Department as had already subscribed, upon the condition that Draughon furnish such personal police service. It was provided that any money collected by Draughon for such service from the date of the agreement should be immediately remitted to the Fox Corporation.

The Fox Corporation agreed to pay Draughon $150 per month for six months, whether it continued to operate its patrol or not, paying $150 in cash, and executing five negotiable promissory notes to him, payable on the first days of May, June, July, August and September, respectively, and agreeing, further to pay Draughon $150 per month after the first six months, if it continued to operate the patrol, the payments to fall due on the first days of each succeeding month, and the payment of this amount was guaranteed as long as said patrol should

be operated by Fox Corporation, its successors or assigns, with the further provision that, if at any time after the first six months, the Fox Corporation should decide to discontinue its patrol service it should give Draughon thirty days' notice of this decision, and payments to Draughon should cease at the expiration of said thirty days; provided, that if it decided to sell its business, Draughon should have a first option to purchase.

Immediately after the execution of this contract Draughon issued a letter to the residents of Belle Meade, which was given to the agents of the Fox Corporation, to use in soliciting contracts, strongly endorsing the corporation and stating that they had worked out a plan which enabled it to come into that community with its patrol with his and the Sheriff's entire approval and co-operation, and that it would operate from the Draughon Fire Hall.

Shortly thereafter the Fox Corporation sent a number of men, with necessary equipment, and established its patrol in Belle Meade, with the approval of the Sheriff, who issued Deputy Sheriff commissions to members of the patrol and took their bonds.

These officers were paid salaries by the Fox Corporation and collected fees from the subscribers. Thereafter complaints were made that the service was not satisfactory, and that some of the men were not giving proper attention to the business. It is apparent from the testimony that Fox Corporation was unfortunate in selecting some of its men. The correspondence indicates that at least one of the men was sent to Hot Springs on account of his dissipated habits, and others substituted. It appears that Fox Corporation recognized the situation and at one time employed Draughon and put him

in charge of the business as chief; and the correspondence shows that his services were entirely satisfactory.

On the 16th day of October, 1933, a supplemental agreement was made in writing between the parties, reciting that a controversy had arisen between the parties as to the validity of the original contract, and as to whether it had been breached by either, or both parties, and providing for reduction of the payments to be made from $150 per month to $100 per month, for a period of three months, beginning November, 1933, not in compromise of any controversy or waiving any rights, but solely for the purpose of allowing the Fox Corporation to have a temporary reduction in operating expenses.

After operating for about one year, on March 1, 1934, Fox Corporation removed from the Draughon Fire Hall to its own headquarters several miles away. Payments were made under the contract with Draughon until the end of February, 1934. A year later, in March, 1935, apparently as the result of misconduct of the men employed by Fox Corporation, the Sheriff cancelled their commissions as Deputy Sheriffs, and the Fox Corporation suspended operations. There was a balance due Draughon under the terms of the contract of $1,950, covering the last thirteen months, for which Draughon sues. That this is the correct unpaid balance according to the face of the agreement is not denied. Defendant filed three special pleas, (1) that it did not owe the plaintiffs, (2) that plaintiffs had no cause of action against it, and (3) that the contract arose out of the unlawful exercise of a privilege (in that the tax had not been paid), and was, therefore, unenforcible in Tennessee.

The case was tried before the Circuit Judge on oral testimony, who held that the suit could not be maintained:

because Draughon had not paid a privilege tax and because there had been a failure of consideration. Later, the Judge filed a memorandum opinion holding that the contract was not enforcible because it was against public policy to permit any private individual the right to sell his authority to enforce the law. Draughon appealed.

The Court of Appeals held that the privilege tax, provided by Code, section 1248.41, for operating a protective agency did not apply, since the contract was one for the sale of the agency, and did not grow out of the operation of the agency, which is the privilege taxed; but held that the consideration of the contract was illegal as against public policy, for the reason that such contracts are liable to control or interfere with governmental functions. Petitions for *certiorari* by both parties have been granted and argument heard.

█ Considering first the petition in this Court of Draughon, we are constrained to differ with the holding of the Court of Appeals that the contract is void as against public policy. It appears from the recitals of the agreement, and the proof otherwise, that Draughon had acquired a good-will of value growing out of his proprietorship and operation of the Draughon Fire Department, to which the private police service to its patrons was an incident and adjunct. This was a valuable property interest, capable of being conducted separately from the Fire Department, and he had the right to sell this good-will to Fox Corporation. Our cases appear to sustain the view that good will is a thing of value and that an agreement to refrain from entering upon, or doing business in competition may be made the basis of a valid contract and is supported by a consideration. *Turner* v. *Abbott,* 116 Tenn., 718, 94 S. W., 64, 6 L. R.

A. (N. S.), 892, 8 Ann. Cas., 150; *Matthews* v. *Barnes*, 155 Tenn., 110, 293 S. W., 993, 52 A. L. R., 1350.

The contract did not provide for an agreement on the part of Draughon, or the Draughon Fire Department, to give to Fox Corporation the right to have deputy sheriffs, or to provide them, although it was understood that a separate consent had been secured by Fox Corporation from the Sheriff of Davidson County to deputize its employees for the purpose of conducting its police patrol, as it was then conducting the same kind of service in the suburbs of Memphis and elsewhere. By the contract, in substance, Draughon transferred to Fox Corporation whatever police protection business he had acquired, or had secured a preferential right to conduct by reason of being first on the ground, his personal associations, etc., and obligated himself, not only not to compete, but to co-operate with Fox Corporation in establishing and extending its business in this section. No official authority was contracted for, or promised. The procurement of deputy appointments was a matter between the sheriff and Fox Corporation.

The proof shows that the Sheriff, of his own motion, owing to the misconduct of Fox Corporation's employees, revoked their commissions, and that this was a cause of the suspension of the business.

Nor do we find the contract under consideration to be invalid on the ground of public policy. It will be readily conceded that a public peace officer may not make contracts affecting the discharge of his official duties. No public officer was a party to this contract, or was undertaken to be bound by it. The learned Court of Appeals says, ''The question is: Has the Sheriff the power to grant to any person seeking to engage in the business

of conducting or maintaining a patrol service or system for the protection of private property, the right to do so?" As already indicated, we do not find this to be the controlling question here, since the contract sued on does not obligate the Sheriff, or seek to control his exercise of authority or discretion. It does not involve an agreement not to enforce the law, or to sell or barter the office or duties of deputy sheriff, or otherwise to interfere with or obstruct the enforcement of the law, or to control its enforcement by legal officers. It is based principally upon the agreement of Draughon to refrain from entering, in competition with Fox Corporation, upon the business of a protective agency, a legal business. "Public policy is manifested by public acts, legislative and judicial." 2 Bouv. Law Dict., Rawles Third Revision, page 2765. We are cited to no Tennessee declarations that the operation of a protective agency is contrary to public policy. On the contrary, the statute of Tennessee, heretofore referred to, Code, section 1248.41, expressly recognizes a "protective agency" as a legal business, exacting a privilege tax for the doing of it. It appears to be generally recognized that a peace officer may lawfully engage to perform services beyond and not in conflict with his official duties and collect compensation therefor. (See C. J., sections 1220 and 1138, under Sheriffs and Constables, and cases cited).

No doubt, under prevailing conditions, an agency of this kind can perform a useful and helpful service, and Fox Corporation, as the record shows, is not only engaged in this business in Tennessee, but has connections, as its advertisements show, in the principal communities of the world, including cities in the United States, listed

in alphabetical order, from Atlanta to Washington, as well as foreign countries, from Belfast to Toronto.

■ "Public policy is a variable quantity" and courts will not hold a contract void as against public policy in cases of doubt. *Stansell* v. *Roach*, 147 Tenn., 183, 246 S. W., 520, 29 A. L. R., 143. 2 Bouv. Law Dict., Rawles Third Revision, page 2765, quotes BURROUGHS, J., as having declared that public policy is "an unruly horse pursuing us, and when once you get astride of it you never know where it will carry you." 2 Bingh., 229.

■■ Passing to the questions raised by the petition of the Fox Corporation, this Court is of opinion that Draughon, as held by the Court of Appeals, is not precluded from recovery on its contract by his failure to pay the privilege tax provided for in Code, section 1248.-41, for the operation of a "protective agency." Draughon was not operating a private police patrol, or protective agency, independent of the Draughon Fire Department, and the contract for the sale of the right to do a business is not one made in pursuance of the business of operating it. The license tax is one imposed on the privilege of exercising certain businesses, callings, professions, or vocations. 17 R. C. L., 475, sec. 2. It is not imposed on the ownership of the business, or a sale of it, or of the good-will incident to it, or an agreement not to exercise the privilege of doing it.

"The essential element of the definition of privilege is occupation and business, and not the ownership simply of property, or its possession or keeping it. The tax is on the occupation, business, pursuit, vocation, or calling, it being one in which a profit is supposed to be derived by its exercise from the general public, and not a tax on the property itself, or the mere ownership of it.

*Phillips* v. *Lewis*, 3 Shan. Cas., [230], 231.'' 10 Michie's Digest of Tenn. Reports (2 Ed.), 522-523, section 3.

■ Cases relied on for Fox Corporation are those in which the contract sued on grew directly out of the exercise of the taxable privilege of doing the business. Furthermore, such incidental police protective business as Draughon did do was without charge or profit, and such business is not taxable. See *Southern Const. Co.* v. *Halliburton*, 149 Tenn., 319, 258 S. W., 409. It may be remarked. in this connection that the insistence that Draughon was liable for the privilege tax because he was doing the business sold to Fox Corporation is hardly consistent with the insistence also urged that he misled Fox Corporation in falsely representing that he was doing such a business.

■ It is apparent from this record, as already indicated, that Fox Corporation was chiefly interested in obtaining the good-will and co-operation of Draughon and his Fire Department, and the chief consideration and inducing cause of the contract was a restraint upon these parties from conducting a competitive agency, such as Fox Corporation expected to install. We think the proof supports the conclusion. that Draughon did co-operate with Fox Corporation at all times, and to its satisfaction, as appears from numerous letters written by Fox to Draughon. This being so, there has been no failure of consideration.

The consideration of this record has been complicated by some shifting of the issues in the progress of the case, and the conflicting views of the courts below. The trial Judge appears to have first decided against plaintiffs on the theory that they were cut off by failure to pay the privilege tax. However, it appears that he later,

after having given the matter further consideration while not announcing an abandonment of his first position, filed a memorandum expressing the view that the contract was not enforcible because against public policy. He prefaces this memorandum with the statement that he wishes "to add by way of explanation that there is a sound reason for holding that the policy contract is not enforcible." As already indicated, the Court of Appeals rejects the defense based on the failure to pay the privilege tax, and concurs with the trial court only on the issue of public policy, and on this ground denies a recovery.

For reasons heretofore stated, this Court concurs with the Court of Appeals as to the non-applicability of the privilege tax, but has found itself unable to agree with that Court that the contract, either in its expressed purpose, or purported consideration, is contrary to any declared sound public policy.

■ Counsel for Fox Corporation argue two other propositions, neither of which seem to have been definitely dealt with by the lower courts, and one of which appears to have come to the front as the case has progressed, (1) that Fox Corporation was induced to execute the agreement by misrepresentation as to the conditions and facts, and (2) that there has been a failure of consideration in that Draughon has failed to perform in accordance with his agreement. Both of these matters have been touched upon in the course of this opinion. We do not find substance in either of these defenses. Both bear ear-marks of being after-thoughts. The correspondence in the record is inconsistent with both, indicating quite clearly that the Fox Corporation entertained no such feeling toward Draughon and his transactions with them as would be reconcilable with

these defenses. Letters written by Fox Corporation six, eight and ten months after the agreement was made, are replete with expressions of appreciation and commendation. It also appears that under the original agreement Fox Corporation reserved an option to terminate the contract after six months. It is significant that they not only did not elect to do so, but made their monthly payments for some twelve months and continued to operate at Belle Meade for some two years. This was a practical ratification of the agreement, rather than such a repudiation as would naturally have resulted if the transaction had been originally misrepresented to the extent now asserted.

It is also significant that throughout the two years, and in fact, not until this suit was brought, were these contentions now made asserted. It will be recalled that six months after the original agreement had been entered into a supplemental agreement was made which practically reaffirmed the original agreement and constituted an election to continue under it, except as to the concessions therein made as to monthly payments. It is true that this supplemental agreement provided that its execution was not to be treated as a waiver of any rights existing, or which might be claimed, under or regarding the original agreement, but the execution of such an agreement at all, after six months of experimentation, seems to us to be wholly inconsistent with the contention now made that Draughon procured the execution of the original agreement by misrepresentations as to his status in operation of a police patrol and as to the patronage which he then had and which he was to turn over to Fox Corporation.

Finding no merit in these contentions for the reasons

indicated, and having reached the conclusion that plaintiffs are not barred from recovery, either by failure to pay a privilege tax, or on grounds of public policy, it results that the decree of the Court of Appeals is reversed and judgment will be here entered for the sum remaining unpaid under the contract, with interest and costs.