CLAYTON v. READ HOUSE CO., No. 3.—141 S. W. (2d) 916.

Eastern Section.  December 4, 1939.

Certiorari Denied by Supreme Court, June 8, 1940.

150

Whitaker & Whitaker, of Chattanooga, for appellant.
Cantrell, Meacham & Moon, of Chattanooga, for appellee.

McAMIS, J.   Complainant below, H. A. Clayton, has appealed from a decree of the Chancery Court denying him a recovery upon $36,750 of certain bonded indebtedness of the Read House Company, a corporation.   The chancellor was of opinion and held that complainant was the holder and owner of interest coupons aggregating the sum sued for but that complainant became the owner of said coupons after maturity and, therefore, subject to the defense of payment to a prior holder which the chancellor found was sustained by a preponderance of the evidence.   The chancellor was further of opinion complainant was engaged in the business of note shaving; that he had never procured a license and paid the fees prescribed by statute and, for that reason, could not maintain a suit upon evidences of indebtedness acquired at a discount.

The assignments broadly challenge these holdings of the chancellor and raise the insistence that the proof fails to sustain the defense of payment and that in any event defendant Read House Company is estopped to interpose this defense for the reason that it knew of complainant's intention of purchasing said bonds and coupons from Paul J. Kent, receiver of the Chattanooga National Bank, and failed or neglected to notify complainant of said defense.   It is insisted that complainant has never engaged in the note shaving business rendering him liable for the statutory license fee but, in any event, that defendant waived the right to rely upon this defense by tendering into court with its answer the sum of $2,900, representing a part of the indebtedness sued upon.

On January 1, 1927, the Read House Company issued a series of seven per cent bonds, 325 in number, for the sum of $1,000 each, secured by a deed of trust upon the hotel furnishings of The Read House in Chattanooga and (subject to a first mortgage of approximately $1,000,000) upon the hotel building.   All the bonds matured January 1, 1937, and attached to each bond were coupons repre-

senting semiannual interest payments of $35 on each bond up to and including January 1, 1937.

It appears that 225 bonds of the series were pledged shortly after the date of their issuance to the First National Bank of Chattanooga and the Chattanooga Savings Bank. These two banks were later merged under the name First National Bank of Chattanooga and the notes of the defendant with supporting collateral became a part of the assets of the new First National Bank which, about the year 1933, became insolvent and failed. Its affairs have since been handled by Paul J. Kent, receiver.

In the spring of 1936, Paul J. Kent, receiver, held two notes of the defendant for $175,000 and $49,000, respectively, to secure the payment of which notes 225 of the Read House Bonds remained pledged.

Complainant, who resides at Nashville, came ot Chattanooga for the purpose of negotiating a purchase from Paul J. Kent, receiver, of certain bonds of a hotel at Cleveland, Tennessee, bringing with him a hotel operator by the name of Myers. Complainant and Myers were advised by Mr. Kent that the bonds of the Cleveland hotel had been previously sold, whereupon complainant asked Mr. Kent if he had anything else for sale. Mr. Kent told complainant of the Read House notes and bonds and subsequent negotiations led to an offer by complainant to purchase the notes and bonds for $50,000. This offer was accepted subject to confirmation by the Comptroller of the Currency and a court of competent jurisdiction Kent, receiver, received the approval of the Comptroller of the Currency and filed a petition in the Chancery Court of Hamilton County seeking authority to accept complainant's offer.

In the meantime defendant, having learned of complainant's intention and offer to purchase its bonds and notes, secured a continuance of the hearing in the Chancery Court and, by a method not necessary to here state, was successful in raising funds with which to bid against complainant. Thus complainant and defendant became rival bidders. Apparently, both were anxious to purchase the notes and bonds at $50,000 and, with the possibility of rival bids developing with the result that the ultimate purchaser might have to pay more than $50,000, several conferences were had between complainant and a committee of three members representing defendant. None of these conferences resulted in any agreement between the parties but about an hour before the Chancery Court was to act upon the matter of confirming the sale of the notes and bonds an agreement was entered into whereby complainant was to purchase 225 of the bonds together with defendant's notes aggregating $224,000 at his bid of $50,000, subject, however, to an agreement to sell to defendant two-thirds of the bonds aggregating $150,000 and cancel its notes of $175,000 and $49,000, respectively, upon defendant

paying complainant two-thirds of his bid plus $2,500. A short contract was hurriedly drawn setting forth this agreement in brief outline.

Nothing was said in any of the negotiations between the parties, nor in the contract to which we have referred, with respect to the interest coupons attached to the bonds totaling in excess of $35,000. Complainant testified that he had these coupons in mind and was pleased that defendant did not bring their existence into the discussion because he wished to trade upon the most advantageous basis possible. The three committee members who negotiated the contract with complainant all testified that they had never been in active charge of defendant's affairs and did not know that coupons were attached to the bonds.

█ With the exception of the last two coupons attached to each bond, maturing July 1, 1936, and January 1, 1937, aggregating $5,250, we think the record supports the chancellor's finding that all of the interest coupons, though still attached to the bonds, were past due at the time they were acquired by complainant by decree of the Chancery Court of Hamilton County on May 30, 1936, and that the coupons were then subject to the defense of payment interposed by defendant. However, the last two coupons on each bond totaling $5,250 were neither paid nor past due at the date of their acquisition by complainant. Since, according to the undisputed proof, they were not paid at that date and were legal subsisting obligations of defendant, whether they were past due when acquired by complainant is immaterial.

The defense of payment is predicated upon an alleged oral agreement between the defendant and the several banks which successively held the bonds as collateral to defendant's notes by which the banks agreed that, so long as defendant kept the interest paid upon its notes to which the bonds were pledged as collateral security, interest payments on the notes would be treated and accepted as retiring the interest coupons upon the attached bonds. We think the record fully supports the chancellor's finding that such an agreement, in fact, existed. Several witnesses, officials of the several banks mentioned, as well as officials of the defendant corporation, testified that such an agreement existed though none of them appear to be able to state definitely when or how such an agreement came into existence. It is immaterial how the agreement came into existence, whether by express agreement or by a course of conduct which grew, by mutual consent, into an agreement. The agreement in question appears to have been based upon the conception of all the parties that the maker of the notes and bonds being the same legal entity but one obligation existed and that a payment upon the one operated as a payment upon the other. It appears that the agreement was carried out by physical detachment

of the coupons from the bonds for a considerable period but, through neglect or oversight or because the bonds and notes were pledged by the bank in Nashville, this practice was discontinued.

■■ When the assets of the Chattanooga National Bank passed into the hands of its receiver, the latter acquired and could transfer to a third person only such right as the bank had to the coupons in question. It is elementary that the purchaser of past-due paper takes it subject to existing equities in favor of the maker. We think the chancellor was clearly correct in sustaining this defense as to all of the coupons which had matured on May 30, 1936, and the assignments complaining of this finding are overruled.

■ To meet this defense complainant invokes the principle that where one of two parties must suffer a loss the one whose negligence occasioned and brought about or made possible the loss must bear the burden and insists that defendant was guilty of negligence in not requiring the coupons to be clipped and delivered to it according to the agreement which it now claims existed between it and the banks and, therefore, should not be permitted to avail itself of the defense of payment to complainant's loss.

Complainant is a banker of many years' experience and if he, in fact, intended to look to the coupons as a part of his investment he was guilty of equal or greater negligence in purchasing past-due paper without making any inquiry for the purpose of determining whether valid' defenses or equities existed in favor of the maker. The record suggests that complainant refrained from projecting this question into the negotiations because he wished defendant to overlook the existence of the coupons.

In a practical sense complainant is not in the position of one sustaining a loss made possible by the negligence of another. The record shows beyond question that the defendant was in financial straits, threatening bankruptcy, and the bonds had only such value as the security covered by the deed of trust represented. This was not in excess of $50,000 as shown by all the proof and it is. extremely doubtful, to say the least, that complainant ever expected to assert a personal action upon the bonds and coupons. He has been paid in excess of $75,000 upon an investment of between $16,000 and $17,000 by payments from defendant upon the bonds. We think the position of complainant that he occupies the status of an innocent person suffering a loss is without merit.

■■ We find nothing in the record upon which to sustain complainant's insistence that defendant should be held estopped to rely upon its agreement with the banks as payment of the past-due coupons. As already stated, the three members of the committee who ,conducted the negotiations in behalf of defendant were ignorant of the existence of coupons attached to the bonds. It is clearly shown that defendant did nothing to induce complainant to pur-

chase the bonds but, on the contrary, tried in every way possible to discourage complainant from bidding so that it might acquire the notes and bonds upon its own account. The parties, having conflicting interests, dealt with each other at arm's length and we think defendant was under no affirmative duty of making known, upon its own initiative, its claim of payment when the past-due condition of the paper itself constituted prima facie notice of dishonor sufficient to put complainant upon inquiry. 8 Am. Jur., 178, sec. 431.

It is a reasonable presumption in respect to such paper either that it has ben paid (United States National Bank v. Floss, 38 Or., 68, 62 P., 751, 84 Am. St. Rep., 752) or that payment has been withheld for an adequate reason. Parker v. Stallings, 61 N. C., 590, 98 Am. Dec., 84; United States National Bank v. Floss, supra.

With notice of dishonor, implicit in the past-due condition of the paper, complainant consciously refrained from making inquiry of defendant. Complainant was not led to act to his prejudice and the elements of estoppel are wanting.

There remains for consideration only the question of defendant's liability upon the coupons which had not matured on May 30, 1936. It is insisted in behalf of defendant that complainant is not the owner of these coupons (as well as those which were past due at the date of purchase) for the reason that bonds and coupons were held only as collateral security by the bank and the collateral was never foreclosed upon by appropriate proceedings brought for the purpose. In this connection it appears that the parties entered into a second contract in August, 1936, which, though the coupons are not specifically mentioned in the provision of the contract relating to this question, is, we think, fairly to be construed as waiving the necessity of foreclosure upon the collateral. We think complainant is the holder of the coupons and may recover upon such coupons as were not due at the date of purchase unless, as the chancellor held, he is precluded from maintaining a suit upon such coupons because of non-payment of the license fee required by Code, Section 1248.63, providing as follows:

"Each person engaged in the business of buying notes, accounts, judgments or other evidences of indebtedness including loans and mortgages at a discount, shall pay a privilege tax. . . .

"Provided, that none of the foregoing provisions of this Item 54 shall apply to or affect persons, firms or corporations carrying on a regular banking business under the laws of the State regulating or pertaining to banks."

A person engaged in such business, who has not paid the privilege tax and obtained a license as required, cannot maintain an action in the courts of the State upon any of the causes of action mentioned in the statute purchased at a discount. Gilley v. Harrell, 118 Tenn., 115, 101 S. W., 424.

■ A person who merely buys a single note, without holding himself out as a dealer, is not liable for the tax. Trentham v. Moore, 111 Tenn., 346, 76 S. W., 904, 905; Gilley v. Harrell, supra.

"Yet the proof of a single act which is characteristic of any of the privileges created by the Legislature is by no means unimportant, because evidence of such act necessarily casts the burden of proof upon the defendant to show that he was not in fact exercising the privilege; that is, engaged in a business or occupation of the kind indicated by the act. The doing of such act makes a prima facie case against him." Trentham v. Moore, supra.

In this case complainant admits that he has not paid the fee and procured a license to conduct the character of business defined by the statute and insists that he has never engaged in such business and is not amenable to the statutory tax.

■ Complainant admits that he has been a "trader" for ten years, among other things trading in bonds. Bonds are evidences of indebtedness covered by the statute and the proof is undisputed that the Read House bonds were purchased at a discount. The question then is: Has complainant engaged in the business of buying "evidences of indebtedness at a discount"?

There is no direct proof that any of the other bonds purchased by complainants were acquired "at a discount" but he admits purchasing two other Read House bonds from other persons and, in view of the straightened financial condition of the Read House Corporation of which complainant was apprised and the meager security pledged as security for the bonds, it may fairly be presumed that complainant would not have purchased these additional bonds except at a discount.

It is further shown that he brought with him to Chattanooga a "prospect" to investigate the buying of bonds of the Cleveland Hotel when he learned of the availability of the Read House bonds. His testimony implies that some of the money with which the bonds were purchased belong to another and complainant admits that another person will share with him in the profits of this transaction.

■ As indicated in the quotation from Trentham v. Moore, supra, from which we have quoted above, the purchase of the Read House bonds, being characteristic of the privilege created by the Legislature, the burden of proof rests upon complainant to show that he is not in fact exercising the privilege.

■ We think the record in this case fails to discharge this burden. The only showing is that complainant had never purchased any other notes but the buying of any "evidence of indebtedness" falls within the purview of the statute. Bonds are evidences of indebtedness and whether the bonds previously purchased by complainant were acquired at a discount was a matter peculiarly within complainant's knowledge and we are constrained to agree with the

chancellor that complainant failed to carry the burden of refuting the implication that he was engaged in a privilege as defined by the statute.

It is insisted in behalf of complainant that defendant waived this defense by paying into court a part of the indebtedness upon which complainant sought a recovery by the bill. The answer filed by defendant at the time the funds were tendered into court expressly pleads complainant's failure to obtain a license and we see no reason why defendant could not admit liability for, and tender into court, any amount which it conceived was justly due complainant without losing the right to rely upon this defense as to the remainder of the claim asserted in the bill for which it disclaimed any liability. The tender into court was pro tanto a waiver of the right to rely upon this defense but, we think, did not waive the right to rely upon the defense of non-payment of the license for which complainant was liable. We think the chancellor correctly held complainant entitled to the fund tendered into court and denied a recovery for the remainder.

Finally, it is insisted the chancellor erred in permitting certain witnesses to testify as to their understanding with respect to the clipping of coupons upon the payment of interest accruing upon defendant's notes. The rule that a witness may not state the impression made on him by oral statements or whether there was an understanding between parties based upon oral statements (22 C. J., 515-516) is relied upon. As we have observed, it is immaterial whether there was originally a definite understanding, based upon a mutual meeting of the minds of the parties, since it conclusively appears that such a contract grew out of continuous dealings between the parties over a period of years which, for a time, was actually carried into effect by the physical detachment of coupons upon payment of interest on the notes. The agreement may have been a tacit one but the proof is, nevertheless, that the parties to the transaction recognized the existence of such an agreement.

We are, therefore, of opinion the testimony goes further than a mere stating of an understanding of the witnesses and that a rejection of this portion of the evidence would not affect the result of the trial below.

We find without merit the contention that evidence of the agreement relied upon by defendant tends to conflict with the written pledge by which the banks acquired the bonds in question. The written contract of pledge does not cover the subject matter of the alleged agreement which, moreover, appears to have been the product of subsequent dealings between the parties.

We find no error in the decree below, and it results that all of the assignments must be overruled and the decree below affirmed, with costs.

Portrum and Ailor, JJ., concur.