In re KEN GARDNER FORD
SALES, INC., Debtor.

FORD MOTOR CREDIT COMPANY,
Plaintiff,

v.

KEN GARDNER FORD SALES, INC.,
and Kyle R. Weems, Trustee,
Defendants.

Bankruptcy No. 1–80–00588.
Adv. No. 1–80–0188.

United States Bankruptcy Court,
E. D. Tennessee.

April 14, 1981.

Smith & Grisham and Brown, Ray & Dobson, Chattanooga, Tenn., for plaintiff.

Weill, Ellis, Weems & Copeland, Chattanooga, Tenn., for defendants.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

### Introduction

Ken Gardner Ford Sales, Inc., (Ken Gardner) was a Ford dealer. Ford Motor Credit Company (FMC) financed the purchase of certain vehicles and retained a security interest. In March, 1980, Ken Gardner filed a petition in bankruptcy under the Bankruptcy Reform Act of 1978. This proceeding involves Ford Motor Credit Company and the trustee in bankruptcy for Ken Gardner. Property in which FMC claimed a security interest was sold by the trustee. Final distribution of the proceeds awaits the outcome of this litigation.

Part I of this memorandum will concern whether the creditor has secured claim; and if so, the amount.

Part II will concern preference questions raised by the trustee.

### Part I

### THE AMOUNT OF THE SECURED DEBT

At the time of Ken Gardner's bankruptcy the amount of debt under the inventory financing agreement was $1,921,833.06. The trustee contends first that FMC has an unperfected security interest. Next the trustee argues, that if perfected, the security interest is limited to $1,250,000.

In 1970 Ken Gardner and FMC entered into an inventory financing agreement. Ken Gardner gave FMC a security interest in its inventory of motor vehicles and their proceeds. FMC filed a financing statement on October 23, 1970 and a continuation statement on October 15, 1975.

Neither the original financing statement nor the continuation statement stated the amount of the secured debt. FMC filed the continuation statement and paid a tax. FMC executed a sworn statement that the amount of the secured debt was $1,250,000 and paid a tax on that amount. The amount of the tax paid is shown on the face of the financing statement.

Before FMC paid the tax in 1975, the debt had reached a high of $1,830,000. At the time FMC paid the tax the debt was $181,375.82 more than the sworn amount. Between payment of the tax and Ken Gardner's bankruptcy, the debt reached a high of $3,179,000. Also, during that time the debt usually exceeded $1,250,000. At the end of only six of the intervening 52 months was the debt less.

More than two months after Ken Gardner's bankruptcy FMC paid the tax and penalties due on the largest amounts that Ken Gardner had owed it. FMC paid the tax and penalties for the purpose of bringing itself within the "escape" provision of the tax law. At the trial the trustee's accountant admitted that FMC's calculations under the escape statute were correct.

The trustee makes several arguments against FMC's security interest. The first argument derives from decisions under Article 9 of the Uniform Commercial Code (UCC) as enacted in Tennessee. Tenn.Code

Ann. §§ 47–9–101— –9–507 (Repl.Vol. 1979).

### The Sworn Statement

■ The following cases decided in this district have held a security interest unenforceable above the amount shown on the financing statement. *In re HGS Technical Associates, Inc.,* 14 UCC Rep.Serv. 237 (Bankr.Ct.E.D.Tenn.1972) *aff'd,* 14 UCC Rep.Serv. 247 (U.S.D.C.E.D.Tenn.1972); *In re Executive Airways, Inc.,* 15 C.B.C. 396 (Bankr.Ct.E.D.Tenn.1977).

■ The purpose of a financing statement is to give notice of the secured party's rights to others who might deal with the debtor. Tenn.Code Ann. § 47–9–402 Comment 2 (Repl.Vol.1979).[1] A financing statement need not state the amount of the secured debt. Tenn.Code Ann. § 47–9–402(1) (Repl.Vol.1979).[2] If, however, an amount is shown and others might reasonably think it is a limit on the size of the debt, then the secured party has given notice of a limit. Others dealing with the debtor could be misled by the apparent limit. For that reason the secured debt should be limited to the amount shown on the financing statement. That is the rationale of the cases. See *Jackson County Bank v. Ford Motor Credit Company,* 488 F.Supp. 1001 (M.D.Tenn.1980).

■ The court does not think the sworn statement that FMC filed should be given the same effect. The sworn statement was not part of the filed financing statement. It could not have misled anyone to believe there was a limit on the amount of the secure debt.[3]

---

1. This Section adopts the system of "notice filing" .... What is required to be filed is not ... the security agreement itself, but only a simple notice .... The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry will be necessary to disclose the complete state of affairs ....

2. A financing statement is sufficient if it is signed by the debtor and the secured party, gives an address of the secured party from which information concerning the security in-

terest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral ....

3. In *In re Core,* No. BK–1–76–1086 (Bankr.Ct.E.D.Tenn., April 5, 1978), this court decided that the boiler-plate language in a security agreement was ineffective to make the agreement secure earlier debts. The amount on which the tax was paid was evidence that the secured party did not intend for the earlier debts to be secured.

The amount of tax paid is shown on the financing statement. The trustee argued that it should be given the same effect as showing the amount of the debt. The argument has validity. As the court points out later, the tax is to be paid on the maximum debt that will be secured. An experienced creditor can easily determine the amount of debt from the amount of the tax paid. The financing statement reflected FMC's payment on less than the maximum secured debt. It could have misled other creditors. Of course the amount of the tax shown on the financing statement was placed there by the Secretary of State. But if FMC had paid the correct amount of tax, the correct amount would have appeared. In any event, the court need not decide this question in light of its decision below on the effect of FMC's failure to pay the correct tax.

### Failure to Pay the Privilege Tax

■ Generally a trustee in bankruptcy has a superior right to the debtor's property subject to a security interest unperfected on the date of bankruptcy. 11 U.S.C. § 544(a); Tenn.Code Ann. § 47–9–301(1)(b) (Repl.Vol. 1979).

It was necessary for FMC to file the financing statement to perfect its security interest in Ken Gardner's inventory and other collateral. Tenn.Code Ann. § 47–9–302(1) (Repl.Vol.1979); *In re Vaughn*, 283 F.Supp. 730 (M.D.Tenn.1968). To continue perfection it was necessary for FMC to file the continuation (financing) statement. Tenn.Code Ann. § 47–9–403(2) (Repl.Vol. 1979). Both financing statements contain the information required by Article 9 for perfection of a security interest. Tenn. Code Ann. § 47–9–402 (Repl.Vol.1979).

Tennessee imposes a tax on the privilege of filing financing statements, including continuation statements. Tenn.Code Ann. §§ 67–4101, –4102, Item S(b) (Repl.Vol. 1976); *Carr v. Chrysler Credit Corp.*, 541 S.W.2d 152 (Tenn.1976); *International Harvester Co. v. Carr*, 225 Tenn. 244, 466 S.W.2d 207 (1971).

The tax is measured by the amount of indebtedness. Tenn.Code Ann. § 67–4102, Item S(b), ¶¶ 1 & 2. (Repl.Vol.1976).[4] FMC paid the tax on $1,250,000 though the debt was greater at the time and had been greater in the past. Before Ken Gardner's bankruptcy the debt increased substantially but FMC did not pay any more tax. The question is how FMC's failure to pay tax on the larger amounts affects its security interest.

It is not disputed that before Ken Gardner's bankruptcy FMC had not paid the amount of tax required by the statute. Clearly the statute required payment on at least the amount of the principal debt at the time of execution of the continuation statement.[5] *International Harvester Co. v. Carr*, above. Thus when FMC filed the continuation statement it paid less than the correct amount of tax.

The statute can be construed to require payment of more tax when the debt increases.[6] The statutes provide little guidance on when it should be paid. That should be considered in determining whether additional tax was timely paid. Tenn. Code Ann. §§ 67–4010, 67–4102, Item S(c), 67–4303 (Supp.1980). But in this case FMC

---

**4.** (b) Prior to the public recordation of any instrument evidencing an indebtedness ... there shall be paid a tax [on] the indebtedness so evidenced.

. . . . .

As used herein the word "indebtedness" shall mean the principal debt or obligation which is, or under any contingency may be, secured at the date of execution of the instrument or at any time thereafter....

. . . .

**5.** Apparently the stipulated figures are "principal" debt. FMC paid the escape statute penal-

ties and tax on the stipulated amounts. The interest on the floor plan debt was paid separately from principal. (discussed below)

**6.** This construction gives full effect to the phrase "at any time thereafter" though the tax shall be paid "prior to the public recordation". (quoted n. 4, above.) "Filing" or "public recordation" is given a broader meaning than physical delivery and acceptance. See UCC § 9–403(1); *Weill v. United Bank*, 5 B.R. 631, (Bankr.Ct.E.D.Tenn.1980) (*In re Poteet*). But see *International Harvester Co. v. Carr*, in text.

was not diligent in paying the correct amount of tax when it filed, much less the additional tax that became due thereafter. Thus FMC also failed to pay the tax that became due after it filed the continuation statement.

The trustee relies on the decision in *Jackson County Bank v. Ford Motor Credit Company*, 488 F.Supp. 1001 (M.D.Tenn. 1980). The decision does support the trustee's argument that FMC's filing was limited by the amount of tax paid. But FMC challenges the decision as being inconsistent with the Tennessee law on which it was based.

The court relied on decisions denying enforceability to contracts because of the plaintiffs' failure to pay a privilege tax.

In *Stevenson v. Ewing* the Tennessee Supreme Court laid down the rules for determining when failure to pay a privilege tax makes a contract unenforceable. 87 Tenn. 46, 9 S.W. 230 (1888). The first consideration is whether the statute expressly prohibits exercise of the privilege without paying the tax. If there is no express prohibition, then it is relevant whether the statute is a revenue measure or part of a regulatory scheme. The next consideration is whether the statute imposes a penalty. A penalty, particularly a recurring one, implies a prohibition.

*Stevenson v. Ewing* has been regularly followed. See, e. g., *Bush Bldg. Co. V. Mayor & Aldermen of Town of Manchester*, 189 Tenn. 203, 225 S.W.2d 31 (1949); *Wright v. Jackson Construction Company*, 138 Tenn. 145, 196 S.W. 488 (1917) rev'd on other grounds, sub. nom. *Chalker v. Birmingham & Northwestern Railway Co.*, 249 U.S. 522, 39 S.Ct. 366, 63 L.Ed. 748 (1919); *Pile v. Carpenter*, 118 Tenn. 288, 99 S.W. 360 (1906); *Singer Mfg. Co. v. Draper*, 103 Tenn. 262, 52 S.W. 879 (1899); *Anderson v. Sanderson*, 25 Tenn.App. 425, 158 S.W.2d 374 (1942); *Clayton v. Read House Co.*, 24 Tenn.App. 149, 141 S.W.2d 916 (1939). In *Farmer v. Farmer*, the court pointed out that as to revenue statutes, late compliance may make a contract enforceable because of the escape statute. 528 S.W.2d 539 (Tenn.

1975). The case did not change the law as stated in *Stevenson v. Ewing*. It merely pointed out that under regulatory statutes late compliance generally will not make an illegal contract enforceable.

The statutes that impose the tax on filing financing statements provide:

It shall be unlawful for any person to exercise any of the privileges made taxable by chapters 40 to 43 . . . before complying with the provisions thereof. Any one exercising any of said privileges without first paying the tax . . . shall be guilty of a misdemeanor and liable for a fine of not less than five dollars ($5.00) for each day such privilege is exercised without a license, which fine shall be in addition to any other penalties herein imposed.

Tenn.Code Ann. § 67–4012 (Repl.Vol.1976).

Every day during which any person subject to the provisions of chapters 40 to 43 . . . shall willfully fail, refuse, or neglect . . . to perform any duty enjoined by said chapters shall constitute a separate and distinct offense.

Tenn.Code Ann. § 67–4014 (Repl.Vol.1976).

No contract . . . made by persons engaged in a business or occupation subject to a license or privilege tax under chapters 40 to 43 . . . shall be . . . unenforceable in the courts because of failure . . . to have paid such license tax . . . provided that such person shall prior to the date of adjudication in the court of original jurisdiction pay double the tax due at the time the contract was made and . . . the penalty prescribed by law.

(the escape statute) Tenn.Code Ann. § 67–4015 (Repl.Vol.1976).

Engaging in the various businesses mentioned in this chapter is declared to be a privilege . . . and any person so engaged shall pay to the commissioner . . . the tax provided therein . . . .

Tenn.Code Ann. § 67–4101 (Repl.Vol.1976).

The occupations, vocations, and businesses taxable are as set forth in the following Items:

[Item S(b) imposes the tax on filing financing statements.]

Tenn.Code Ann. § 67–4102 (Repl.Vol.1976).

■ The court must conclude that there are express and implied prohibitions of exercising any of the privileges without paying the tax. No exception is made for the filing of financing statements. There is no room for the revenue-regulatory distinction. Filing without paying the tax is prohibited and illegal. If the contract cases are applied then filing without paying the tax, being illegal, will not be given effect by the courts.

FMC has argued several distinctions. The problem is in applying the contract cases to this situation.

Generally the other privileged activities can be carried on without paying the tax.[7] On the other hand, payment of this tax is a prerequisite to exercise of this privilege. You can't file if you don't pay a tax. The tax cannot be entirely avoided. It can be partly avoided by paying less than the correct amount. This situation is not substantially different because the tax can only be partly avoided. There can still be a violation of the statutes—an "illegal" filing.

■ The security agreement was the contract between FMC and Ken Gardner. A security agreement is enforceable between the parties without regard to whether a financing statement has been filed. See Tenn.Code Ann. §§ 47–9–203 & 47–9–301 (Repl.Vol.1979). The taxed privilege is filing financing statements, not making secured loans. The failure to pay the tax would not affect the contract between the parties. It can only affect the filing, the perfection of the security interest against third parties.

The exercise of the filing privilege does not directly involve the making of contracts. Most of the cases have involved contracts made without paying the tax. Such contracts have been held unenforceable between the parties. The financing statement is not a contract to be held unenforceable at the trustee's urging.

The argument has some merit, but does not hold up when the privilege tax cases are considered in light of the illegal contract cases in general. Enforcement between the parties is typically the question because their contract has an illegal consideration or object or its performance requires commission of illegal acts. See, e. g. *Whitley v. White*, 176 Tenn. 206, 140 S.W.2d 157 (1940); *Stansell v. Roach*, 147 Tenn. 183, 246 S.W. 520 (1922); *Bendet v. Ellis*, 120 Tenn. 277, 111 S.W. 795 (1907); *Potts v. Gray*, 43 Tenn. 468 (1866).

In privilege tax cases the contract may be illegal only because the plaintiff was prohibited from making it without paying the tax. Formation of the contract was illegal, not its performance. See *Gilley v. Harrell*, 118 Tenn. 115, 101 S.W. 424 (1906); *Trentham v. Moore*, 111 Tenn. 346, 76 S.W. 904 (1903); *Anderson v. Sanderson*, above; *Clayton v. Read House Co.*, above. In those cases the tax was on the privilege of buying evidences of indebtedness but the courts held the evidences themselves not enforceable if bought before the tax was paid. See also *Whitley v. White*, above.

The privilege tax cases illustrate the courts' refusal to aid wrongdoers more than the rule applied to contracts whose performance would be illegal. The Tennessee Supreme Court has recognized that the "voidness" concept generally applied to illegal contracts is not particularly appropriate where the contract is prohibited but its performance does not involve any illegality. *Biggs v. Reliance Life Ins. Co.*, 137 Tenn. 598, 195 S.W. 174 (1917); *Singer Mfg. Co. v. Draper*, above.

The point is that the courts will not give a plaintiff the benefit of a contract growing directly out of its "illegal" exercise of the privilege.[8] The same principle should apply

---

7. Item I establishes a litigation tax that is like this one in that the method of collection makes it difficult, if not impossible, to avoid. But it differs in that the amounts are invariable. See also Tenn.Code Ann. § 67–4203 (Supp.1980).

8. FMC clearly violated the prohibition. Cases where making the contract did not violate the

to the illegal filing of a financing statement. The secured party should be denied the benefit of filing. It cannot have the benefit of doing what it was prohibited from doing. See *Miller v. Morrow*, 43 Tenn. 587 (1867).[9] It is not a defense that another party will receive a windfall benefit. *Ross v. Crow*, 68 Tenn. 420, 425–426 (1877).

In the opinion of the court FMC has an enforceable security interest and the real question is the degree of enforceability. It is usually said that a contract made in violation of a statute is void. The court will deny it any enforcement unless the statute provides otherwise or the court can see that it was not the purpose of the legislature to make the contract void. See *Virginia Surety Company v. Knoxville Transit Lines*, 135 F.Supp. 606 (E.D.Tenn.1955); *Poss v. Albert*, 139 Tenn. 1, 200 S.W. 976 (1917); *Biggs v. Reliance Life Ins. Co.*, above; *Insurance Companies v. Carrier Companies*, 91 Tenn. 537, 19 S.W. 755 (1892) aff'd sub nom. *Merchants' Cotton-Press & Storage Co. v. Insurance Company of North America*, 151 U.S. 368, 14 S.Ct. 367, 38 L.Ed. 195 (1894); *Ross v. Crow*, above; *Perkins v. Watson*, 61 Tenn. 173 (1872); *Sporrer v. Eifler*, 48 Tenn. 633 (1870); Annot., 55 A.L.R.2d 481 (1957).

If FMC had paid the correct tax initially, the court would not hesitate to hold its filing enforceable for the amount on which the tax was paid. *Jackson County Bank v. Ford Motor Credit Company*, above. But when FMC filed the continuation statement, it did not pay the correct amount of tax. If the voidness rule of the contract cases is applied, then FMC's filing is entitled to no effect. The statute in this case does not specifically make the filing void as the statute did in *Miller v. Morrow*. The court is of the opinion that the voidness rule may be harsh in this case.

Allowing partial enforceability may encourage further cheating on payment of the tax. The court hopes not. The question of cheating and enforceability arises only when there is litigation. If the secured party has not complied with the escape statute, partial unenforceability will usually be a penalty that fits the secured party's transgression.[10] Secured parties who do not pay tax on the correct amount bear the risk that their security interests will be partly unenforceable.

■ Some differences in this tax are relevant. The privilege is not one whose exercise directly involves the making of contracts. The penalties and the escape statute are more appropriately worded for such privileges. This privilege cannot be exercised without paying some tax. If the instrument reveals the debt, the correct amount should be paid. If a sworn statement is filed, the secured party who wishes to pay less must be willing to swear falsely. In other words, collection of this tax is less avoidable than for others. Underpayment when the instrument is physically filed may be the result of error rather than of intentional wrongdoing.[11] The court is giving FMC the benefit of every doubt in this case. Otherwise, it would hold FMC's filing entirely ineffective.[12]

■ Under the facts of this case the court holds that at the time of Ken Gard-

---

prohibition are inapposite. *Draughon v. Fox-Pelletier Corp.*, 174 Tenn. 457, 126 S.W.2d 329 (1939); *Krasner v. Moore*, 32 Tenn.App. 306, 222 S.W.2d 623 (1949); *Petway v. Loew's Nashville & Knoxville Corp.*, 22 Tenn.App. 59, 117 S.W.2d 975 (1938).

**9.** In *Sporrer v. Eifler*, 48 Tenn. 633 (1870), the court reached a different result by not applying the federal statute.

**10.** Unenforceability is in the nature of a penalty. *Wender v. Lobertini*, 151 Tenn. 476, 267 S.W. 367 (1924).

**11.** In *Pickett v. Green's Garage* the correct amount was paid but wrongly applied; the court held substantial compliance was sufficient. 35 Tenn.App. 290, 245 S.W.2d 415 (1951).

**12.** The argument based on the UCC is rejected. The instrument was entitled to be filed under Article 9. The question is how the tax statutes, which also apply, affect the filing.

ner's bankruptcy, FMC's financing statement was effective to perfect its security interest for $1,250,000, the amount on which tax was paid.

The trustee argues that the decision in *Jackson County Bank v. Ford Motor Credit* is to the contrary. Ford paid tax on an increase in the debt but the court held it did not make the secured debt enforceable for the increase. The court emphasized Ford's failure to comply with the escape statute. It is not clear whether the court meant that payments of additional tax must always comply with the escape statute or only that failure to satisfy the escape statute before suit makes the increased debt unenforceable despite the additional payment. In either case it is failure to comply with the escape statute that leads to unenforceability. The decision is not contrary to this court's decision to give FMC's filing partial effect.

This brings the court to the question of whether FMC could make its filing completely enforceable by complying with the escape statute after Ken Gardner's bankruptcy. The escape statute is set out above.

### The Escape Statute

As set out earlier, the trustee's rights in property are generally superior to a security interest unperfected on the date of bankruptcy. That results from the trustee's rights under § 544(a) of the Code. But there is an exception:

The rights and powers of the trustee under section 544 . . . are subject to any generally applicable law that permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of such perfection . . . .

11 U.S.C. § 546(b) (1979).

The legislative history of the section says:

The phrase "generally applicable law" relates to those provisions of applicable law that apply both in bankruptcy cases and outside of bankruptcy cases. For example, many State laws, under the Uniform Commercial Code, permit perfection of a purchase-money security interest to relate back to defeat an earlier

levy by another creditor if the former was perfected within ten days of delivery of the property. U.C.C. § 9–301(2). Such perfection would then be able to defeat an intervening hypothetical judicial lien creditor on the date of the filing of the petition. The purpose of the subsection is to protect, in spite of surprise intervention of a bankruptcy petition, those whom State law protects by allowing them to perfect their liens or interests as of an effective date that is earlier than the date of perfection. It is not designed to give the States an opportunity to enact disguised priorities in the form of liens that apply only in bankruptcy cases.

S.Rep.No.95–989, 95th Cong., 2d Sess. 86 (1978); H.R.Rep.No.95–595, 95th Cong., 1st Sess. 371 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5872, 6327.

As it relates to this case, a statute within the exception would be a generally applicable law allowing a later perfected security interest to have priority over the trustee's earlier attached judgment lien. See, e. g., UCC §§ 9–301(2), 9–312(4).

The escape statute is not such a law. It allows a taxpayer to cure an illegality so that its otherwise valid rights will be enforced by the courts. The escape statute deals not with the time of perfection but with whether otherwise valid rights are enforceable. For example, under the UCC there was nothing wrong with FMC's perfection, but because of its failure to pay the correct tax, the court should deny enforcement to the perfection. The court concludes that the escape statute is not within the exception.

The more difficult question is whether § 544(a) and § 546(b) are irrelevant. In the absence of bankruptcy, failure to have paid the correct tax or complied with the escape statute would have made FMC's security interest partly unenforceable in litigation. *Jackson County Bank v. Ford Motor Credit Company.* Bankruptcy interposed the rights of the trustee as a judgment lien creditor, which rights are superior to an unperfected security interest. But bank-

ruptcy is not the commencement of litigation and unenforceability may not be the same as unperfection.

Under Tennessee law FMC could have complied with the escape statute at any time before litigation. But the rights of creditors are generally fixed at the time of bankruptcy. After bankruptcy a creditor's actions taken within the time allowed by state law will improve its rights only if some exception in the bankruptcy law so provides. See, e. g., 11 U.S.C. § 362(a) & (b)(3), § 547(e)(2)(A) & (C)(ii).

■■■ The automatic stay that became effective when Ken Gardner filed was broad enough to have enjoined FMC's filing in an attempt to comply with the escape statute. 11 U.S.C. § 362(a)(1) & (4). The court has already rejected FMC's argument that the escape statute is within the § 546(b) exception. If it were, a secured creditor who had not paid the tax could improve its rights after bankruptcy by complying with the escape statute at any time before it or the trustee brought suit. The situation would cause a race to the courthouse. The court does not believe § 546(b) was meant to include statutes such as the escape statute.

The argument for FMC would be more compelling if, though it owed more tax at the time of bankruptcy, it was not delinquent in paying it and had regularly paid any additional tax that became due.

In summary, the filing of a bankruptcy petition is not the commencement of litigation and § 544(a) does not make the trustee a hypothetical litigant, but it and other sections of the code fixed FMC's rights at the time of bankruptcy and no exception allowed FMC to improve its rights by complying with the escape statute after bankruptcy.

As to perfection, the court in *Jackson County Bank* held the debt on which the tax was not paid was illegal. In that sense FMC would be in virtually the same position as a creditor with an invalid security agreement for part of the debt. FMC's security interest would be "unperfected" under the UCC. J. White & R. Summers,

Handbook of the Law under the Uniform Commercial Code § 24–2 (2d ed. 1980). The defect could not be cured after bankruptcy.

This court rejected the trustee's argument that under Article 9 of the UCC, FMC's financing statement was not entitled to be filed. Rather the court held that FMC's filing was illegal because it violated the tax laws. Thus FMC can argue that its security interest was perfected as far as the UCC, particularly § 9–301(1)(b), is concerned. But the argument overlooks the effect of making an illegal filing. The financing statement may have been entitled to be filed under Article 9 but the illegal filing made it at least partly unenforceable.

The tax is on the privilege of filing financing statements. It is first imposed at the time of filing. The purpose of filing is to perfect a security interest. The court is not prepared to hold that the definition of perfection in UCC § 9–303(1) should be read without regard to the tax law.

Part II

PREFERENTIAL TRANSFER
QUESTIONS

The trustee seeks to recover certain payments to FMC on the ground that they were preferential transfers. The trustee also contends that FMC's compliance with the escape statute after bankruptcy cannot help it, because to the extent its security interest was unperfected at the time of bankruptcy, there was a preferential transfer.

Under the floor plan arrangement FMC financed Ken Gardner's purchase of vehicles from Ford Motor Company. FMC retained a security interest in the vehicles and their proceeds.

Ken Gardner executed a separate note for each vehicle or group of vehicles purchased from Ford Motor Company as they were added to the floor plan inventory. When a vehicle was sold, the proceeds were deposited to Ken Gardner's general bank account. It included deposits from sources other than the sale of vehicles financed under the floor plan arrangement. Within two days of a sale Ken Gardner was re-

quired to forward to FMC payment of the principal balance of the wholesale cost of the vehicle. Apparently that means Ken Gardner paid the balance due on the loan principal attributable to that vehicle.

When FMC paid Ford Motor Company for vehicles bought by Ken Gardner, the interest on the loan began to accrue. It was calculated daily and billed monthly. The bill was usually sent about the fifth or sixth day of the month after the interest accrued.

On January 15, 1980, Ken Gardner paid FMC $34,742.45 interest due for December, 1979. On February 19, 1980, Ken Gardner paid FMC $29,390.17 interest due for January, 1980. The payments were from Ken Gardner's general account. Ken Gardner did not pay the interest due for February or March, 1980. It filed its petition in bankruptcy on March 28, 1980.

During the 90 days before bankruptcy Ken Gardner incurred new debts and made payments to FMC under the floor plan arrangement. Apparently the new debts were for advances made by FMC. Ninety days before bankruptcy the principal of the floor plan debt was $2,132,900.15. On the date of bankruptcy it was $1,921,833.06. Thus, advances and payments during the 90 days before bankruptcy resulted in a net reduction in the principal debt of $211,067.09.

At the end of December, 1979 the principal of the floor plan debt was $2,251,399. At the end of January, 1980, it was $2,042,704. At the end of February, 1980, it was $2,103,372.

The trustee testified that he had on hand about $700,000, which includes $422,627.99 which FMC claims as part of its security in this case. Pursuant to a settlement with American National Bank it was to be paid about $200,000. The trustee also testified that there were some accounts receivable to be collected and some unpaid obligations from the chapter 11 proceeding, the amounts of which he did not know for certain.

As a result of the settlement American National Bank was expected to have an unsecured claim for several hundred thousand dollars. FMC had filed unsecured claims totaling about $630,000. In summary, the trustee testified that if he is not successful in this case the payment on unsecured claims will be nothing or very little.

### The Preference Statute

Section 547(b) of the code defines preferential transfers:

(b) Except as provided in subsection (c) . . . the trustee may avoid any transfer of property of the debtor—

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
(4) made—
(A) on or within 90 days before the filing of the petition . . .

. . . .

(5) that enables such creditor to receive more than [it] would receive if—
(A) the case were a case under chapter 7 of this title;
(B) the transfer had not been made; and
(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Some of the requirements are not in dispute. All of the transfers were to or for the benefit of FMC, a creditor. The debtor is presumed to have been insolvent during the 90 days before bankruptcy. 11 U.S.C. § 547(f). FMC did not offer evidence to rebut the presumption. Not all the other requirements are in dispute as to each of the challenged transfers.

■ The definition of transfer should also be noted.

[T]ransfer means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, or disposing of or parting with property or with an interest in property, including retention of title as a security interest.

11 U.S.C. § 101(40). Obviously the grant or retention of a security interest is a transfer.

### Security Interests Not Perfected at the Time of Bankruptcy

With regard to the effect of FMC's failure to pay the tax, the trustee's argument under the preference statute is in the alternative to his argument under § 544(a). The argument must be in the alternative because to the extent the trustee prevails under § 544(a), there could not have been a preferential transfer of a security interest. Thus the court must assume that its decision above was wrong.

■■■■■ Under the preference statute one problem is more easily solved than it was under § 544(a). Under § 544(a) the court was concerned with perfection under the UCC and the distinction between it and unenforceability. For the purpose of the preference statute a transfer of personal property is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee. 11 U.S.C. § 547(e)(1)(B). Because of FMC's failure to have paid the correct tax, a creditor on a simple contract could have acquired a superior judicial lien. *Jackson County Bank v. Ford Motor Credit Company.* Thus at the time of bankruptcy there was an unperfected transfer to FMC of a security interest in Ken Gardner's property.

■■■ The time of perfection also determines when a transfer was made for the purpose of the preference statute. The general rule is that a transfer is made when it is perfected rather than when it takes effect between the parties. 11 U.S.C. § 547(e)(2)(A) & (B). The transfer of a security interest takes effect between the parties when the debtor acquires rights in the collateral, or in UCC terminology, when the security interest attaches. 11 U.S.C. § 547(e)(3); UCC § 9–204 & § 9–303(1). Delayed perfection can make a transfer preferential.

FMC argues that when it complied with the escape statute, perfection of its security interest related back to when it would have

been perfected if the correct tax had been paid at all times. There would have been no delay in perfection.

■■■ Under the preference statute perfection relates back only as allowed by it. The exception in § 546(b) for state laws allowing relation back does not apply to the preference statute.

The preference statute provides a ten day grace period. The transfer of a security interest is made when the security interest attaches if it is perfected within ten days thereafter. Otherwise the transfer is made when it is perfected. 11 U.S.C. § 547(e)(2)(A) & (B) & (e)(3); UCC §§ 9–204 & 9–303(1). The ten day grace period continues to run after bankruptcy. 11 U.S.C. § 547(e)(2)(C)(ii).

The court is dealing with collateral acquired before bankruptcy. FMC did not comply with the escape statute within ten days after bankruptcy. The ten day grace period does not help it as to any of the collateral.

At the time of bankruptcy FMC's security interest was partly unperfected. Another rule applies to transfers not perfected at the time of bankruptcy or within the ten day grace period. They are deemed to have been made immediately before bankruptcy. 11 U.S.C. § 547(e)(2)(C).

Usually an unperfected transfer of a security interest will not be challenged as a preferential transfer. This is because the trustee in bankruptcy under 11 U.S.C. § 544(a) and the UCC has rights superior to an unperfected security interest. But the court has assumed that the trustee will not prevail under § 544(a). That presents an unusual situation where a security interest perfected for the purpose of § 544(a) was not perfected for the purpose of the preference statute. That can happen because § 544(a) is subject to state laws allowing perfection to relate back. The preference statute has its own rules, which may impose a shorter time for perfection in order for it to relate back. Since the trustee supposedly cannot prevail under § 544(a), the transfer can be preferential even though it was a

transfer of a security interest not perfected at the time of bankruptcy.

FMC has argued that it is protected by certain exceptions to the trustee's power to avoid preferential transfers. But several of the exceptions clearly do not help FMC.

■ The enabling loan exception is limited by a requirement that perfection be within ten days. There was no proof that FMC's compliance with the escape statute was within ten days of Ken Gardner's acquisition of any of the collateral in question. 11 U.S.C. § 547(c)(3). Another exception applies only to transfers after the challenged transfer. That would be transfers by FMC after bankruptcy. The exception does not help FMC. 11 U.S.C. § 547(c)(4).

The exception for contemporaneous exchanges does not fit well. Suppose that five days before bankruptcy FMC made an advance to Ken Gardner which it immediately used to buy a vehicle for its inventory. Because FMC's security interest was not fully perfected at the time of bankruptcy, the transfer occurred not when the security interest attached but five days later, at the time of bankruptcy. Nevertheless a five day delay might still be within the contemporaneous exchange exception, especially since perfection within the next five days would put the transfer back to when the security interest attached.

FMC presented no proof that there were any such transfers. The court cannot say that the exception applies as to any of the collateral. Furthermore, it is not clear the exception was meant to apply to late perfection of a security interest not within the ten day rule or another exception. See *In re Kelley*, 3 B.R. 651, 6 B.C.D. 395, 2 C.B. C.2d 15 (Bkrtcy., Ct. E.D.Tenn.1980) (*Weill v. Tennessee Central Credit Union*); J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code § 24-4 at 1006 (2d ed. 1980).

■ There is also the question of whether the transfer was on account of an antecedent debt owed before the transfer was made. The debt in question was the debt in excess of $1,250,000. The transfer was es-sentially the attachment of FMC's security interest to secure more than $1,250,000 of the debt. The transfer occurred immediately before bankruptcy because it was unperfected at the time of bankruptcy.

If strictly construed the "antecedent debt" requirement would seldom be a defense. A transfer on account of a debt is almost always on account of a debt already owed. Antecedence generally has to do with the permissible lapse of time between when the debt was incurred and the transfer made. As to cars acquired with FMC's loans, the debt was incurred about the time the transfer of the security interest took effect between the parties. Unperfection delayed the transfer to immediately before bankruptcy. Immediately before bankruptcy may have been close to the time when part of the debt was incurred. But the rule putting the transfer immediately before bankruptcy must be read in light of the general rule that a transfer is made when perfected. Putting the transfer immediately before bankruptcy is meant to make it within the preference period and for an antecedent debt. 3 Collier on Bankruptcy ¶ 60.51 at 1043 (14th ed. 1975). The rule should not save a transfer unless it is specifically shown that part of the debt was incurred shortly before bankruptcy. Technically the debt was antecedent.

■ Clearly the transfer immediately before bankruptcy of a security interest perfected for the purposes of § 544(a) would prefer FMC under the test set out in § 547(b)(5). FMC's compliance with the escape statute cannot help it because if the security interest is safe under § 544(a), there was a preferential transfer to the extent it was unperfected for the purpose of the preference statute.

### Improvement of Position

The trustee seeks to recover the amount by which the debt was reduced during the 90 day preference period. The trustee's contention that the reduction was a preferential transfer rests not only on § 547(b) but on one of the exceptions in § 547(c).

The exception applies to transfers to a creditor with a *perfected* security interest in the debtor's inventory. It establishes the improvement of position test. 11 U.S.C. § 547(c)(5). A decrease in the secured debt is not necessarily a preference. It is a preference only if the creditor became more secured because the unsecured deficiency was reduced.

█ In this case the rule must be considered in light of the court's holding that FMC's security interest is perfected only for $1,250,000 of the debt. During the 90 days there was no increase or decrease in the amount of debt that could be validly secured.

FMC could have been preferred as to its *perfected* security interest only if there was an unsecured deficiency 90 days before bankruptcy—only if the collateral was worth less than $1,250,000. On the date of bankruptcy the collateral was worth considerably more. It was closer to the amount of the debt. The amount of the principal debt was necessarily closely related to the value of the collateral. It is reasonable to conclude that 90 days before bankruptcy the collateral was worth more than $1,250,000, since the debt was over $2,000,000.

The trustee cannot recover the reduction in the debt as improvement in the value of FMC's perfected security interest.

### Reduction of the Debt as Payment of an Unsecured Debt

It appears that at all times during the 90 days before bankruptcy the debt was greater than $1,250,000. Should the court treat the reduction in the total debt as payment on an unsecured debt?

This is not a typical situation where the value of the collateral determines the extent to which a creditor with a perfected security interest is secured. 11 U.S.C. § 506(a). In such a case the improvement of position test can be applied. FMC's perfection and its secured status is limited to a certain amount, though the debt and the value of the collateral was greater. FMC's situation is similar to that of a creditor with collateral worth more than the debt. Arguably FMC had a perfected security interest in each item of collateral but can enforce it against the trustee only for a total of $1,250,000 of the debt. Generally payments on an over-secured debt do not give the secured creditor more than it would receive in bankruptcy and therefore are not preferential.

FMC is not in the same position as an oversecured creditor. That can be seen by applying the statutory test for determining whether a creditor was preferred. A transfer is preferential if it

(5) . . . enables such creditor to receive more than [it] would receive it—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of [the] debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b)(5).

This is a case under chapter 7 of the Bankruptcy Code. FMC is entitled to $1,250,000 because on the date of bankruptcy it had a security interest perfected for that amount and collateral worth $1,250,000. The remainder of its debt would be paid as unsecured.

The trustee testified that there will probably be little payment on unsecured claims. If the debt had not been reduced during the preference period, FMC would be paid $1,250,000 and little, if any, on an unsecured debt of $882,900.15.

█ During the preference period payments to FMC exceeded further advances by $211,067.09. In other words, FMC was paid $211,067.09, which is about 24% of the unsecured $882,900.15. Obviously FMC was preferred.[13]

---

**13.** Section 547(b)(5)(B) apparently does not mean the court has to consider what the situation would be if Ken Gardner's estate at the time of bankruptcy was increased by the amount of the payments. 9 Am.Jur.2d § 549 at 145–146 (1980). In any event, FMC would still

 FMC again argues that certain of the exceptions are applicable. The most likely one is § 547(c)(4). If the creditor gives new value to the debtor after the preferential transfer, the new value may be a set-off against the transfer. The new value must not be secured by an unavoidable security interest and must not cause the debtor to make an unavoidable transfer to the creditor. 11 U.S.C. § 547(c)(4) & (a)(2). The stipulated facts are that FMC received payments and made advances during the 90 days before bankruptcy. Some of FMC's advances may have been within the exception. But FMC did not prove any particular sequence of transactions. This is not an aggregate exception.

Furthermore, the trustee sought to recover the net reduction in the debt, thereby giving FMC an aggregate exception for advances made during the preference period without regard to whether all would be within the exception.

 The payments might be protected by the contemporaneous exchange exception. When Ken Gardner sold a new car it used the proceeds to pay FMC the principal debt for the purchase money loan from FMC. If the car was subject to an unavoidable security interest which was released, there might be a contemporaneous exchange of new value. But that argument was settled against FMC by the court's earlier decisions. Since the debt over $1,250,000 was secured by an avoidable security interest, all that was released was an avoidable security interest. No new value was given.

The ordinary course exception does not appear to be applicable to the payments in question. There was no proof that it applies to any of the payments. 11 U.S.C. § 547(c)(2). The enabling loan exception is obviously not applicable to the payments. 11 U.S.C. § 547(c)(3). The improvement of position test has already been rejected.

The court concludes that the reduction in the unsecured portion of the debt resulted from preferential transfers. Except for the preference requirement, FMC did not seriously dispute that the payments met the criteria of § 547(b). That is a reasonable conclusion in light of the course of business between Ken Gardner and FMC. Occasionally Ken Gardner may have sold a vehicle shortly after it bought it with FMC's money. But that course of events obviously did not happen often enough. The point is that the exceptions generally require specific proof. Only one exception is an aggregate exception. Once there is proof that a transfer is within § 547(b), the creditor has the burden of proving that it is protected by one of the exceptions.[14]

### *Payment of Interest*

That brings the court to the question of whether the interest payments were preferential transfers. FMC relies on the exception for payments in the ordinary course of business. 11 U.S.C. § 547(c)(2). It provides:

(c) The trustee may not avoid ... a transfer—

(2) to the extent such transfer was—

(A) in payment of a debt incurred in the ordinary course of business ... of the debtor and the transferee;

(B) made not later than 45 days after such debt was incurred;

(C) made in the ordinary course of business ... of the debtor and the transferee; and

(D) made according to ordinary business terms.

As FMC points out, the issue is when the interest debts were incurred. If they were incurred only as the interest accrued, then all the December interest and the interest accrued in January, after the first four days, was paid within the 45 day limit.[15]

---

have been preferred since it would receive only a share of the increase.

14. In light of the court's conclusions it need not consider the trustee's argument based on UCC § 9–306(4)(d).

15. The interest that accrued on December 1, 1979 was paid within 45 days afterward when paid on January 15, 1980.

In another case this court held that the debt for the principal of a loan was incurred when the loan was made. Installment payments more than 45 days afterward were not protected by the ordinary course exception. *In re Bowen*, 3 B.R. 617, 6 B.C.D. 254, 1 C.B.C.2d 1090 (1980) (*Weill v. Southern Credit Union*). See also *In re McCormick*, 5 B.R. 726, 6 B.C.D. 889, 2 B.C.D. 1145 (Bankr.Ct.N.D. Ohio 1980) (*Belfance v. BancOhio/National Bank*); *In re Williams*, 5 B.R. 706, 6 B.C.D. 930, 2 C.B.C.2d 1216 (Bankr.Ct.S.D. Ohio 1980) (*Ledford v. Sears, Roebuck & Company*). The principal debt was incurred when the debtor obtained the money and agreed to repay it. The debtor then had a legally binding obligation to repay the lender. *In re McCormick*, above. The installment payments merely reflected the nature of the loan as an extension of credit. It may be correct to say that a debt is incurred when the debtor has a legally binding obligation to pay the creditor. R. Levin, A Introduction to the Trustee's Avoiding Powers, 53 Am.Bankr.L.J. 173, 187 (Spring, 1979).

But it is necessary not to confuse the time when payment is due with the time when the obligation to pay arises. For example, in a contract to supply electricity, first there is an agreement that the customer will pay for the electricity. When it is furnished the obligation to pay arises.[16] Likewise, as to a completed contract for the sale of goods, it may be said that the debt for the price was incurred at the latest when the buyer would have been liable for it in the absence of agreement.[17] An agreement for payment at a later date would be an extension of credit. An agreement for payment earlier would make incurrence of the debt earlier.

FMC can argue that the interest debts were like the debt for electricity in the example above. The point is that Ken Gardner could not owe the debt for interest for one day until the next. Before then there was nothing to be paid, no "binding obligation".

In terms of "binding obligations", the argument has some merit. If the court were dealing only with the antecedent debt requirement it would be inclined to hold the payments were on account of an antecedent debt. In another case this court pointed out that whether a debt is antecedent generally depends on whether it was incurred for new value received by the debtor at or after the time of the challenged transfer. *Still v. City Bank & Trust Company*, 11 B.R. 30 (*In re DG & Associates, Inc.*) (Bankr.Ct.E.D.Tenn.1981). The payment of unsecured interest accrued on an antecedent debt generally does not give the debtor new value but obviously can prefer the creditor over other unsecured creditors.

The exception in question does not depend on the receipt of new value. It and the contemporaneous exchange exception apparently are derived from defenses based on the antecedent debt requirement of § 60(a) of the Bankruptcy Act. 3 Collier on Bankruptcy ¶ 60.19 (14th ed. 1975). Another exception is related to the antecedent debt requirement. 11 U.S.C. § 547(c)(3). The court has already remarked on its belief that antecedence depends on the receipt of new value at the time when a debt is incurred. The other exceptions require the receipt of new value by the debtor. This exception would be consistent if construed to mean a debt is incurred only when new value is given. It is not clear the exception should be so limited.

The legislative history seems to imply that whatever other policy justifications may be supported by excepting these

---

**16.** See 4 Collier on Bankruptcy ¶ 547.39 at 547–121 (15th ed. 1980); but see J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code § 24–4 at 1006 (2d ed. 1980).

**17.** See 4 Collier on Bankruptcy ¶ 547.39 at 547–121 (15th ed. 1980); R. Levin, An Introduction to the Trustee's Avoiding Powers, 53 Am. Bankr.L.J. 173, 187 (Spring, 1979).

types of transfers from challenge as preferences, the intent of Congress was to insure that the preference provisions were not to be utilized to disrupt "normal financial relations," it being the general policy of the preference provisions to discourage "unusual action by either the debtor of his creditors during the debtor's slide into bankruptcy." The legislative history thus appears to stress the policy of the preference provisions, which is that of facilitating the policy of equality of distribution among creditors by requiring any creditor who has received a greater payment than others of his class to disgorge what he has received so that all may share equally. In support of the 1978 Code's provisions in this regard . . . it might also be argued that another overriding policy favors rehabilitation of a debtor rather than liquidation; to the extent that the Code protects, from preference attack, vendors, and the like, who, even despite known financial difficulties of the vendee, continue to provide goods and services required by the debtor in order to continue the ordinary course of business, the vendor requiring only that the account be kept reasonably current, contributes to the possibility of a debtor's at least avoiding liquidation, if not avoiding resort to the Bankruptcy Code at all.

9A Am.Jur.2d, Bankruptcy § 552 at 158–159 (1980).[18]

To some extent the policies mentioned appear to depend on the debtor's receipt of new value as the consideration for incurring the debt. But Congress did not mention new value in this exception as it did in others. Congress did not define incurrence of a debt with reference to new value, though in most cases that may be appropriate. The policy of protecting payments in the ordinary course of an ongoing business relationship easily extends to these interest payments.

The court concludes that this exception protects these payments to the extent they were of interest accrued within 45 days before the payments. Thus all of the first payment is protected. The second payment includes four days interest that accrued more than 45 days before. The court does not know the exact amount of the interest for that four days and so cannot grant the trustee a judgment for its recovery. Accordingly, the trustee is not entitled to recover any of the second payment.

### Postpetition Transfers

The trustee also attacks FMC's compliance with the escape statute as affecting an avoidable postpetition transfer. 11 U.S.C. § 549. Of course, FMC's payment was itself not a transfer of property of the estate. The court has heretofore held that FMC's compliance with the escape statute did not and could not improve its rights from what they were at the time of bankruptcy. Therefore, the court need not consider whether compliance with the escape statute resulted in a postpetition transfer of property of the estate.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 752.

---

**18.** The committee reports both say the same thing:

The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.
S.Rep.No.95–989, 95th Cong., 2d Sess. 88 (1978); H.R.Rep.No.95–595, 9th Cong., 1st Sess. 373 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5874, 6329.